IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 20, 2004 Session

## 94TH AERO SQUADRON OF MEMPHIS, INC. v. MEMPHIS-SHELBY COUNTY AIRPORT AUTHORITY v. SPECIALTY RESTAURANT CORPORATION

Direct Appeal from the Chancery Court for Shelby County
No. 100988-2     Arnold B. Goldin, Chancellor

_____

No. W2003-00227-COA-R3-CV - Filed November 2, 2004

_____

This appeal involves the termination of a commercial real estate lease agreement. Among a multitude of other claims, Plaintiff, Lessee, contends that Defendant, Lessor, breached the lease by failing to provide lessee with notice of default, sufficient to satisfy the terms of the lease. Additionally, Lessee argues that Lessor violated section 29-18-101, *et seq.* of the Tennessee Code Annotated (Forcible Entry and Detainer) by re-entering the leased premises without first obtaining a writ of possession. Lessee appeals from the trial court's final judgment in favor of Lessor. We affirm as modified.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified and Remanded

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Larry E. Parrish, Memphis, Tennessee, for the appellants, 94th Aero Squadron of Memphis, Inc. and Specialty Restaurant Corporation.

R. Grattan Brown, Jr., William L. Hendricks, Jr., and Jeremy G. Alpert, Memphis, Tennessee, for the appellee, Memphis-Shelby County Airport Authority.

### OPINION

On January 4, 1978, Memphis-Shelby County Airport Authority ("Lessor") and 94th Aero Squadron of Memphis, Inc. ("Lessee") entered into a long-term lease agreement for premises located at the Memphis International Airport. Under the lease, Lessee agreed to construct, at its

own cost, a restaurant complex, including parking, landscaping, and an access road. The lease also provided that, upon the termination of the lease, "any buildings and improvements remaining on the demised premises . . . shall *ipso facto* . . . vest in and become the property of Lessor, free and clear of all liens and encumbrances, subject only to Lessee's rights of removal of trade equipment . . . ." The lease had a base term of twenty years, with two options for renewal periods of ten years each. Minimum rent was set at $2,000 per month.

From 1980 to March, 1988, Lessee built, operated, and maintained on the leased premises a restaurant facility known as the "91st Bomb Group Restaurant." Specialty Restaurants Corporation ("Specialty"), Lessee's parent company and third-party defendant, joined in the execution of the lease for the purpose of guaranteeing the obligations of Lessee from the inception of the lease and continuing for a two-year period following the date the restaurant opened for business. Specialty is a corporation organized under the laws of California.

The 91st Bomb Group Restaurant is best characterized as an "airport theme restaurant," consisting of a free standing restaurant located on an airport adjacent to a runway. David Tallichet (Mr. Tallichet) is the founder and president of Specialty and, since 1959, has either operated or leased up to eighty-four restaurants throughout the United States. Arthur Longoria (Mr. Longoria), a licensed, practicing attorney, was employed by Specialty from 1988 to 1995. Mr. Longoria served as "manager of transactions," and, in that role, was directly in charge of handling the lease at issue in this case. Jerry McMichael (Mr. McMichael) began working for Lessor in 1988 and was responsible for all matters pertinent to this appeal. He testified at trial on behalf of Lessor.

Pursuant to the lease agreement, Lessee covenanted to, *inter alia*, maintain the premises in good order and repair and keep the restaurant open for business. These specific covenants were found in Articles 10 and 11 of the lease. Article 24 of the lease contained a termination clause and right of reentry clause. Under Article 24.(4) of the lease, Lessor had the "right to terminate this agreement in its entirety immediately upon the happening of . . . [t]he abandonment or discontinuance of the operation and services by the Lessee." In addition, this power of termination clause gave Lessor the right to terminate the lease upon the "failure by the Lessee to perform, keep and observe any other of the terms, covenants and conditions in [the lease] . . . after the expiration of thirty (30) days from the date written notice ha[d] been given to the Lessee by the Lessor to correct such default or breach." Lessor's right of reentry under the lease provided as follows:

> In the event of the cancellation or termination of this Lease by the Lessor the Lessor may immediately or at any time thereafter re-enter the demised premises or any part thereof in the name of the whole and repossess and have the same as of Lessor's former estate and remove therefrom all goods and chattels not properly belonging, and expel said Lessee and all other persons who may be in possession of said demised premises, and that, too, without demand or notice.

Under the lease, all notices were to be in writing and sent by registered mail to the addresses specified in the lease or to such address as was designated thereafter by either party. Pursuant to the lease, notice was effective on the date of dispatch.

The restaurant opened for business in 1980, but, due to a salmonella incident that occurred in 1981, the restaurant never achieved continued success. According to Mr. Tallichet, the salmonella incident "destroyed" the restaurant. In March 1988, due to a lack of profitability, Lessee closed the restaurant. Lessee neither requested nor received authorization from Lessor before discontinuing restaurant operations. Between March 1988 and June 27, 1991, the date the lease was officially terminated, the restaurant remained closed and vacant. Despite continued assurances from Lessee that it was progressing towards finding an assignee or sublessee, the restaurant remained closed. During these three years, Lessee made no attempt to reopen and operate the restaurant. From the time Lessee discontinued restaurant operations until June, 1991, Lessee continued to make rental payments, albeit sometimes delinquent, and Lessor accepted those rental payments. Meanwhile, Lessor cooperated with Lessee's efforts in transferring the lease, and on occasion Lessor itself sought potential subtenants for the premises.

By April, 1991, the restaurant and surrounding area were in a state of disrepair. A section of ceiling had collapsed as a result of flooding from a burst pipe. Overgrown grass, weeds, shrubs and debris covered the grounds. The military aircraft relics located about the premises had been neglected and were missing parts. Security fencing around the facility was not in compliance with FAA and Airport Safety Regulations. The structure had been vandalized, and there was evidence that homeless persons were using the building for shelter. In sum, the premises appeared dilapidated and abandoned.

By early April, 1991, in addition to the unkempt condition of the premises and closure of the business, Lessee's rent was in arrears. Further, Lessee had failed to maintain a current certificate of insurance coverage as required by the lease. On April 8, 1991, Lessor mailed a letter to Lessee, via certified mail, giving notice of these defaults and demanding Lessee correct the defaults within the time provided under the lease. In this letter, Lessor stated, in all capital letters, "PLEASE CONSIDER THIS YOUR NOTICE TO CORRECT THE DEFAULTS ENUMERATED ABOVE."

Between April 23 and June 27, 1991, Lessor and Lessee corresponded by telephone and letter. Lessee made repeated representations indicating it would cure all the breaches and maintaining confidence in finding a successor to the lease. On May 17, 1991, thirty-nine days after the April 8 default notice, Lessee mailed a current certificate of insurance to Lessor. In its accompanying letter, Lessee represented that it had "commenced to make arrangements in order to clean up the debris and make repairs to the security fencing." Additionally, in the May 17 letter, Lessee stated that it hoped to have an executed sublease agreement ready for Lessor's approval during the week of May 20th. Lessee, however, never executed the sublease and never completed any transaction for the transfer of the lease. On May 24, 1991, Lessor faxed to Lessee

six pages of landscaping contractors copied from the Memphis area yellow pages. Despite this assistance, the run-down condition of the premises was never remedied.

On June 27, 1991, eighty days after the notice of default, Lessor mailed to Lessee a notice of termination of the lease, effective immediately. On or about that date, Lessor placed a padlock on the gate to the facility. Despite notice of termination, Lessee mailed and Lessor inadvertently deposited a rent check for the month of July. When Lessor became aware of this mistake, Lessor returned a check in the same amount to Lessee. Lessee continued to make rental payments for the months of August and September, each of which was returned by Lessor without depositing.

*Procedural History*

To describe the thirteen years of litigation preceding this appeal as "protracted" would be an understatement. The record on appeal is congested with a myriad of pre-trial motions, discovery motions, trial memoranda, post-trial motions, and the like. Lessee commenced this case on January 24, 1992. In its complaint for declaratory judgment, filed in the Shelby County Chancery Court, Lessee alleged that Lessor breached the termination provisions of the lease, and Lessee sought specific performance of the lease. On April 28, 1992, Lessor answered and counter-claimed, averring that Lessee in fact breached the lease through multiple defaults. Lessor also included a third-party complaint against Specialty, asking the court to hold Specialty responsible as successor to the duties and responsibilities of Lessee under the lease. On August 26, 1992, the trial court granted Lessor's Motion to Require an Election of Remedies, estopping Lessee from seeking specific performance because Lessee had told Lessor that it was seeking money damages only, and, based on those representations, Lessor had entered into another lease.

Both parties subsequently filed motions for summary judgment. On June 23, 1993, the trial court entered an order denying both parties' summary judgment motions. After several motions, responses and a hearing, on March 4, 1994, the trial court entered an order allowing Lessor to demolish the building located on the demised premises. On August 31, 1993, Specialty filed a voluntary petition in bankruptcy in a California bankruptcy court, seeking reorganization under Chapter 11. Pursuant to 11 U.S.C. § 362(a), an automatic stay was placed on all proceedings in the trial court until Specialty's Chapter 11 affairs were concluded, and Lessee gave notice to this effect on September 14, 1993. Except for the order permitting the demolition of the restaurant, all action in this case ceased until after Specialty emerged from bankruptcy.

Trial was set for November 28, 2000. On November 3, 2000, Lessee filed its first proposed amended complaint. In its proposed amended complaint, Lessee presented several theories of recovery, including conversion, trespass, and inverse condemnation that were not alleged in the original complaint filed over eight years before. On November 8, 2000, Lessor filed and the court heard Lessor's motion to strike the amended complaint. At this hearing, the court gave Lessee the option to amend the complaint "anyway you feel like you want to" or proceed on the original complaint. Because of the quickly approaching trial date and the new claims presented in the amended complaint, the trial court made its permission to amend

contingent on the granting of a trial continuance to Lessor. Lessee opted not to amend its complaint.

The bench trial began on November 28, 2000 and continued for five days. The court filed written findings of fact and conclusions of law, ruling, among other things, that Lessee was in default of the lease; that Lessor had properly given notice of those defaults and properly terminated the lease; that pursuant to the lease, as the prevailing party, Lessor was entitled to reasonable attorneys' fees; and that Specialty, because of its complete dominion and control over Lessee, was liable for the contractual obligations of Lessee. On November 14, 2002, the trial court entered final judgment awarding Lessor $41,458.71 in discretionary litigation costs and $381,689.75 in attorneys' fees, for a total judgment of $423,148.46. Courts costs were assessed against Lessee and Specialty. Lessee appealed.[1]

Although Lessee lists nineteen issues on appeal,[2] we perceive the issues as follows:

(1) Whether the trial court erred in finding that Lessee defaulted on the lease and that Lessor properly gave notice of those defaults and properly terminated the lease.

(2) Whether the trial court erred in failing to find that by reentering the premises without a writ of possession, Lessor was in violation of section 29-18-101, *et seq.* of the Tennessee Code.

(3) Whether the trial court erred in allowing Lessee to amend its complaint only if Lessee agreed to a trial continuance.

(4) Whether the trial court erred in excluding the proffered testimony of Lessee's expert, Philip Kolbe, Ph.D.

---

[1]Under Rule 27(i) of the Tennessee Rules of Appellate Procedure, arguments in the appellant's brief shall not exceed fifty (50) pages, "[e]xcept by order of the appellate court or a judge thereof." Tenn. R. App. P. 27(i)(2004). Lessee's initial brief contains a section entitled "Argument" consisting of slightly in excess of forty-one pages, which incorporates by reference arguments raised in its trial court briefs and memoranda. [Trial briefs are excluded from the record. Tenn. R. App. P. 24(a).]. In addition, a separate section entitled "Summary of Argument" contains eight pages. Thus, in reality, Lessee's argument exceeds the fifty-page limit by hundreds of pages.

Rule 27(a)(5) of the Tennessee Rules of Appellate Procedure requires an appellant brief to contain a "statement of the case, indicating briefly the nature of the case, the course of proceedings, and its disposition in the court below." Tenn. R. App. P. 27(a)(5). The appellant brief in the instant case contains a section entitled "Statement of the Case" that consists of some eighty pages, which includes the text of letters; verbatim cites from transcript, the text from "Tenant's Concise Statement of Undisputed Facts"(some five pages); Landlord's response thereto; and the text of Tenant's ninety-eight proposed findings of fact and Landlord's response thereto.

[2]Lessee raises a number of issues on appeal that were neither pled in its complaint nor tried by consent in the lower court. Unless an unpled claim has been tried by consent in the trial court, it cannot be raised for the first time on appeal. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Fidelity-Phenix Fire Ins. Co. v. Jackson*, 181 S.W.2d 625, 629 (Tenn. 1944).

(5) Whether the trial court erred in denying Tenant's motion to appoint a Special Master for the calculation of compensatory damages.

(6) Whether the trial court erred in granting Lessor's motions *in limine* excluding deposition testimony, where deponents were California residents and no advance notice was given that the depositions were intended to be used as evidence.

### *Standard of Review*

The standard of review of a trial court sitting without a jury is *de novo* upon the record of the trial court. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). The trial court's findings of fact are presumed correct, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d)(2003). On issues of witness credibility, the trial court is able to observe witness testimony and evaluate a witness's demeanor. Thus, the court's assessment of a witness's credibility will not be disturbed without clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). On questions purely of law, no presumption of correctness attaches to the trial court's conclusions, which are reviewed *de novo*. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 275 S.W.3d 913, 916 (Tenn. 2000).

### *Law and Analysis*

#### (1) *Breach of Lease*

In its brief, Lessee presents an array of issues that all seem to drive towards one question -- whether the Lessor breached the lease by failing to give proper notice of default and notice of termination of the lease. Lessee also contends that Lessor waived any breach of the lease on the part of Lessee by accepting rental payments during the months the restaurant was closed through the date of termination, July 27, 2001.

#### (a) *Sufficiency of Notice*

The interpretation of lease terms is governed by traditional rules of contract construction. *Planters Gin Co. v. Federal Compress and Warehouse Co.*, 78 S.W.3d 885, 889 (Tenn. 2002) When construing contracts, the words contained within the instrument should be given their plain, ordinary meaning, and, "in the absence of fraud or mistake, a contract must be interpreted and enforced as written, even though it contains terms which may be thought harsh or unjust." *Heyer-Jordan & Assoc., Inc. v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990)(citing *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79 (Tenn. Ct. App. 1983)). If the contract language is unambiguous, the written terms control, not the "unexpressed intention of one of the parties." *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526, 530 (Tenn. Ct. App. 1981). The rights and obligations of parties to a contract are determined by the terms written in the

agreement. *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys.*, 884 S.W.2d 458, 461–62 (Tenn. Ct. App. 1994).

The lease at issue in this case clearly and unambiguously obligated Lessee to perform certain covenants. Under the lease, Lessee agreed to, among other things, continuously operate a restaurant and maintain the premises in good order and repair. There is no serious dispute that Lessee failed to perform these covenants. Restaurant operations were shut down beginning March, 1988, and the condition of the premises deteriorated steadily thereafter. The lease, by its terms, granted Lessor the right to terminate the lease for these defaults. The chancellor found that Lessee "made numerous representations . . . that [it would] . . . assign or sublease the premises to a third party that would re-open the restaurant or use the property for another valid business purpose." The trial court further found that, relying on these representations, Lessor was induced to permit Lessee to continue under the lease. Lessor attempted to assist Lessee in its purported efforts to find a subtenant and procure landscaping services to restore the premises to an acceptable condition. Pursuant to the lease, Lessee was given affirmative notice to correct these defaults within thirty days of the notice, dated April 8, 1991. Lessee did not cure these defaults, and on June 27, 1991, some two and one-half months after the notice of default, Lessor mailed a letter of termination of the lease effective immediately. These findings by the chancellor are amply supported by the record.

Lessee first contends that the April 8, 1991 notice of default was unreasonable because it was insufficient to put Lessee on notice that, if Lessee failed to cure the defaults, Lessor would terminate the lease. The record, on the other hand, paints a much different picture. Besides indicating to Lessee that rent was outstanding and that Lessee's certificate of insurance had expired, the April 8th letter recited, in relevant part, the following: "Article 24 of the lease provides for immediate termination of the lease upon 'the abandonment or discontinuance of the operation and service by Lessee.' We feel that this situation has occurred." The letter continued by restating Article 24 of the lease which provides for termination of the lease for failure to perform the covenants within the lease, "after the expiration of thirty (30) days from the date written notice has been given to the Lessee by the Lessor to correct such default or breach." At the close of this paragraph in the letter, Lessor included the following statement in all capital letters, "PLEASE CONSIDER THIS YOUR NOTICE TO CORRECT THE DEFAULTS ENUMERATED ABOVE." Moreover, when asked to review this letter at the trial, CEO and President of Lessee, David Tallichet, testified that "[the letter] does look like a notice of default." It is clear from the record that the notice of default was unmistakable, and Lessee clearly understood the purpose of the letter.

Lessee also contends that Lessor improperly terminated the lease by regaining possession of the premises without seeking a writ of possession. As stated previously, the record reflects that Lessee was in breach of numerous provisions of the lease. After putting Lessee on notice of certain defaults and failing to cure those problems, Lessor was well within its rights under the lease to terminate. Lessee's primary contention, however, deals with the manner in which Lessor

proceeded after the June 27, 1991 letter of termination.  We will separately address the issue of whether a writ of possession was necessary in this case.

## (b)  *Waiver*

Lessee also asserts waiver on the part of Lessor.  The fact that Lessor assisted Lessee in its efforts to find a subtenant, while accepting rental payments for the months[3] of April, May, and June 1991 does not, as Lessee suggests, serve as a waiver of Lessor's rights under the lease. Waiver is commonly defined as the "voluntary relinquishment of a known right[,] established by express declarations or acts manifesting an intent not to claim the right."  *Tenn. Asphalt Co. v. Purcell Enter., Inc.*, 631 S.W.2d 439, 444 (Tenn. Ct. App. 1982).  In general, by accepting benefits under a contract with knowledge of a breach, the non-breaching party waives the breach. 17 Am. Jur. 2d *Contracts* § 447 (1964).  The analysis, however, does not stop there, as Tennessee law also holds:

> [M]ere efforts on the part of an innocent party to persuade the promisor, who repudiates his agreement, to reject that repudiation and proceed honorably in the performance of his agreement have been held not to involve a waiver of the innocent party's right to avail himself of the breach after the efforts finally prove unsuccessful.

*Id.; W.F. Holt Co. v. A&E Elec. Co., Inc.*, 665 S.W.2d 722, 733 (Tenn. Ct. App. 1983). Negotiating with another party in the face of a breach by that party will not constitute a waiver, where such action was the result of misrepresentation by the breaching party.  *W.F. Holt Co.*, 665 S.W.2d at 733–34.  Waiver may also be shown by "express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive."  *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998)(quoting *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384, 389 (Tenn. 1942)).

In this case, Lessor never indicated that it was releasing or waiving its rights under the lease by cooperating with Lessee's attempts to cure the defaults.  In fact, there is nothing in the record to indicate Lessee ever asserted a waiver on the part of Lessor.  On repeated occasions, Lessee represented that it was close to finding a subtenant and was arranging to have the premises repaired.  In reliance on Lessee's repeated assurances, Lessor cooperated with Lessee in working towards an amicable resolution.  While attempting to cure the numerous defaults, Lessee

---

[3]The trial court also found that Lessor received and deposited a rental payment for July 1991, after the lease was terminated, June 27, 1991.  The trial court found that this payment was deposited in error and was immediately returned.  Because of failure to cite to any authority to support its contention that this mistaken "acceptance" was an irrevocable waiver, Lessee's argument is without merit.  "The law will not presume a waiver, and the party claiming the waiver has the burden of proving it by a preponderance of the evidence."  *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998)(citing *Koontz v. Fleming*, 65 S.W.2d 821, 825 ( Tenn. Ct. App. 1933)).

remained obligated under the lease to pay rent.  By accepting those rental payments, Lessor was not waiving any breach on the part of Lessee because Lessee understood that it remained obligated under the lease to operate a restaurant or find a suitable replacement and restore the premises to a good state of repair and condition.  When it became apparent that Lessee was either unwilling or unable to fulfill these promises, Lessor terminated the lease.  We hold the trial court did not err in finding that Lessor did not waive the covenants under the lease by accepting rental payments after the notice of default.

### (2) *Reentry Without Writ of Possession*

Soon after Lessor's July 27, 1991, letter of termination, Lessor went onto the premises and placed a padlock on the outside gate.  Lessor proceeded in this fashion based upon the right-of-reentry provision in the lease, which states as follows: "In the event of the cancellation or termination of this Lease by the Lessor the Lessor may immediately or at any time thereafter re-enter the demised premises or any part thereof in the name of the whole and repossess and have the same as of Lessor's former estate. . . ."  Lessor contends, and Lessee vehemently disputes, that under the facts of this case Lessor was not required to resort to the courts to reenter and repossess the premises.  Lessor bases its argument on the existence of the bargained-for right-of-reentry provision in the lease and the fact that the premises had been vacant for three years.  Lessee argues that despite the unoccupied appearance of the building, Lessee was still in "possession" of the premises, thus Lessor was required to seek a writ of possession under section 29-18-101, *et seq.* of the Tennessee Code (Forcible Entry and Detainer).

Since 1821, Tennessee has had a statute that "creates a right to bring a cause of action for a writ of possession when a lessee remains on the leased property after the lease has been terminated."  *Cain P'ship Ltd. v. Pioneer Inv. Servs. Co.*, 914 S.W.2d 452, 456 (Tenn. 1996).  Section 29-18-101 of the Tennessee Code provides that "[n]o person shall enter upon any lands, tenements, or other possessions, and detain or hold the same, but where entry is given by law, and then only in a peaceable manner."  Tenn. Code Ann. § 29-18-101 (1999 Supp.).  The legislative intent behind the creation of Forcible Entry and Detainer (FED) actions was to provide a streamlined summary procedure to determine the rights to possession of land, in contrast to the old formal common law ejectment action.  *Newport Hous. Auth. v. Ballard*, 839 S.W.2d 86 (Tenn. 1992).  FED proceedings also serve the function of preventing violence and breaches of the peace that result from the inherent friction caused by repossessing property through self-help.  *Childress v. Black*, 17 Tenn. 317, 320 (1836); 35A Am. Jur. 2d *Forcible Entry and Detainer* § 6 (2001).  To avoid these conflicts, the party seeking to repossess the land must do so with the aid of a writ of possession issued by the court.  *Hayes v. Schweikarts Upholstering Co.*, 402 S.W.2d 472, 484 (Tenn. Ct. App. 1965).

The cases construing Tennessee FED law hold that, absent abandonment or surrender of the premises by the tenant, the landlord is required to seek a writ of possession before reentering the land.  *Cain P'ship*, 914 S.W.2d at 456–57; *Matthews v. Crofford*, 167 S.W. 695, 698 (Tenn. 1914); *Hayes*, 402 S.W.2d at 484; *Cutshaw v. Campbell*, 3 Tenn. App. 666, 688–89 (1925);

*William B. Tanner Co. v. United States*, No. C-75-337, 1976 WL 1065, at *4 (W.D. Tenn. June 16, 1976). Although other states allow a commercial tenant to waive its statutory protection from self-help repossession through a right-of-reentry clause, in Tennessee, "the action of unlawful detainer is the legal substitute for personal entry." *Matthews*, 167 S.W. at 698. In *Cutshaw v. Campbell*, this Court stated, "the jurisdiction of the courts to determine these questions of disputed sovereignty cannot be delegated to individuals." *Cutshaw*, 3 Tenn. App. at 688. The court further stated that even if the right-of-reentry provision undertook to allow for self-help, "it was right in the teeth of the law, subversive of its peaceful process, and void." *Id.*

In its brief to this Court, Lessor cites *Nashville Record Productions, Inc. v. Mr. Transmission, Inc.*, 623 S.W.2d 281 (Tenn. Ct. App. 1981), for the proposition that, pursuant to a right-of-reentry clause, a commercial landlord may repossess leased premises without a writ of possession. The primary issue in *Nashville Record* was whether a lease provision could waive the common law requirement that rent be demanded before a forfeiture could be declared. *Id.* at 282. In *Nashville Record*, the tenant was in default for failure to pay rent, and after several notices to cure, the landlord declared the lease forfeited. *Id.* The landlord then brought an action to recover possession in March 1980, which was ultimately granted by the trial court in October 1980. *Id.* at 283. In May 1980, subsequent to the initiation of the possession action, the tenant vacated, whereupon the landlord locked the premises. The appeal by the landlord centered around whether it was entitled to rents from the time the tenant vacated in May through the time the writ of possession was issued in October. *Id.* This Court denied the landlord rent for those months during which the premises were vacant but no order of possession had yet been issued because we found that the landlord had possession and use of the premises from the time of actual repossession forward. *Id.* at 284. The lease's right-of-reentry clause had no bearing on the holding in *Nashville Records*, as the landlord gained possession by initiating the FED action. *Id.* at 283. *Nashville Records* is not determinative to the case at bar because the landlord there did, in fact, seek and obtain a writ of possession pursuant to section 29-18-127 of the Tennessee Code.

Other states have adapted their FED law, either by statute or case law, to allow for reentry without judicial process in the commercial lease context. *See, e.g., Rucker v. Wynn*, 441 S.E.2d 417, 419 (Ga. Ct. App. 1994); *Clark v. Service Auto Co.*, 108 So. 704, 707 (Miss. 1926). In those states, a commercial landlord may reenter under a right-of-reentry provision to effect a self-help repossession without judicial process if the repossession can be achieved without a breach of the peace. *Rucker*, 441 S.E.2d at 420; *Craig Wrecking Co. v. S.G. Loewendick & Sons, Inc.*, 526 N.E.2d 321, 326 (Ohio Ct. App. 1987); *Liberty Indus. Park Corp. v. Protective Packaging Corp.*, 335 N.Y.S.2d 333, 336–37 (N.Y. Sup. Ct. 1972). By statute in Georgia, in any *residential* lease, a landlord or tenant may not waive any rights or obligations contained in the sections covering dispossession proceedings. Ga. Code. Ann § 44-7-2 (2003). Therefore, Georgia courts have held that, by implication, commercial lessors may avoid FED proceedings through the inclusion of default and right-of-reentry provisions. *Colonial Self-Storage of South East, Inc. v. Concord Props., Inc.*, 249 S.E.2d 310, 311 (Ga. Ct. App. 1978). Tennessee's FED statute, however, does not distinguish between residential and non-residential property.

Under the facts of this case, despite the lease provision for reentry, Lessor was required to seek a writ of possession before reentering the premises. In this case, however, Lessor would have been entitled to possession had it proceeded according to the unlawful detainer statute, and Lessee has failed to show any actual damages suffered from Lessor's failure to seek and obtain a writ of possession before repossessing the property. Thus, Lessee is entitled to nominal damages only. *Cutshaw v. Campbell*, 3 Tenn. App. 666, 689 (1925)(holding that tenant who was unlawfully dispossessed but had no rights in the property after the date of termination entitled to nominal damages only).

### (3) *Permission to Amend Complaint Made Contingent on Continuance of Trial*

Under Rule 15.01 of the Tennessee Rules of Civil Procedure, once a responsive pleading is served or the time allowed for amendment has expired, a party may amend the party's pleadings "only by written consent of the adverse party or by leave of court; and leave shall freely be given when justice so requires." Tenn. R. Civ. P. 15.01 (2004). The rule's provision that "leave shall be freely given" has been liberally construed to "lessen[] the exercise of pre-trial discretion on the part of the trial judge." *Branch v. Warren*, 527 S.W.2d 89, 91–92 (Tenn. 1975). Therefore, the court should freely grant the amendment, so long as prejudice to the opposing party can be avoided. *Harden v. Danek Med., Inc.*, 985 S.W.2d 449, 454 (Tenn. Ct. App. 1998); *Campbell County Bd. of Educ. v. Brownlee-Kesterson, Inc.*, 677 S.W.2d 457 (Tenn. Ct. App. 1984). The court, however, retains discretion to condition the amendment in order to minimize prejudice to the opposing party in maintaining his or her action or defense. For example, the court may condition the amendment on the granting of a continuance or the posting of a bond. *Gardiner v. Word*, 731 S.W.2d 889, 892–93 (Tenn. 1987). The trial judge's decision "will not be reversed unless [an] abuse of discretion is shown." *Harden*, 985 S.W.2d at 454 (quoting *Welch v. Thuan*, 882 S.W.2d 792, 793 (Tenn. Ct. App. 1994)).

Here, Lessee filed its original complaint on January 24, 1992. The case finally went to trial on November 28, 2000. According to Appellant's brief, the case was first set for trial on February 12, 1999 but was postponed by the trial judge until October 1999. The October trial date was further postponed until November 28, 2000. Lessee argues that both of these continuances were on the trial court's own motion.[4]

During a pre-trial hearing on August 16, 2000, the trial judge set a deadline of November 1, 2000 for the filing of any additional court documents. The court stated to counsel for both parties that it wanted to maintain a "drop-dead" trial date and have "no more surprise motions." Counsel for both parties agreed that nothing further would be filed past that date. In fact, Lessee's counsel made repeated statements that he did not want to file anything else. On August 29, 2000, the trial court issued a scheduling order instituting a November 1, 2000 deadline for the filing of any additional court documents.

---

[4]Lessee does not cite to the record in support of its assertion that the two previous trial dates were postponed "*sua sponte*."

On November 3, 2000, Lessee filed a motion to amend its complaint. This motion was filed two days after the agreed upon deadline, almost nine years after the original complaint, and three weeks before trial. The proposed amended complaint included claims for relief that were not pled in the original complaint, including claims for trespass, conversion, and inverse condemnation. Lessee argued in the trial court that the amended complaint would do nothing more than memorialize the theories of recovery Lessee had been claiming throughout the pre-trial stages of this case, and that Lessor was on notice that Lessee was pursuing these claims. On November 8, 2000, Lessor filed a motion to strike Lessee's proposed amended complaint. At the November 8, 2000 hearing on this matter, the chancellor stated to Lessee's counsel that he would allow Lessee to "amend this lawsuit anyway you feel like you want to," but that he was not going to require the Lessor to go to trial on November 28th. Therefore, Lessee had the option to amend its complaint and have the trial postponed or go to trial as scheduled on the original complaint. Lessee chose the latter. In light of the looming trial date and the assertion of new claims in the proposed amended complaint, we cannot say the chancellor abused his discretion by conditioning leave to amend on Lessee's agreement to a continuance of the trial.

(4) *Proffered Expert Testimony of Philip Kolbe, Ph. D.*[5]

In this case, Lessee sought to recover damages for the cost of reconstruction, lost profits, and the value of the leasehold interest. Proceeding to trial, Lessee's primary expert witness on the issue of damages was Philip Kolbe, Ph.D. ("Dr. Kolbe"), a professor of finance and real estate at the University of Memphis. Both parties and the chancellor conducted a lengthy *voir dire* of Dr. Kolbe. During the questioning, Dr. Kolbe responded that he never saw the actual premises or any of the building plans. His opinion as to construction costs was based on general knowledge rather than any specific factual basis pertaining to the premises at issue. He did not come prepared to testify to the value of comparable real estate and could not remember the names of people he spoke with regarding comparable real estate values. Dr. Kolbe's valuation of the leasehold interest was based on comparables to which he could not identify and two offers for the leased premises that, according to Mr. Tallichet, "never materialized."

Under Rule 702 of the Tennessee Rules of Evidence, a witness may testify in the form of opinion on scientific, technical, or other specialized matters. Tenn. R. Evid. 702 (2004). Before a court will allow such expert testimony, the proponent must first show that (1) the witness is "qualified as an expert by knowledge, skill, experience, training, or education[,]" and (2) the testimony will "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* If the underlying facts or data upon which the witness bases his/her opinion "indicate lack of trustworthiness," the court must disallow the so-called expert testimony. Tenn. R. Evid. 703 (2004); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). The

---

[5]In its brief to this Court, Lessee has characterized the trial court's exclusion of Dr. Kolbe's testimony as premised solely upon the fact that Dr. Kolbe was not a licensed real estate appraiser. Nothing in the record indicates, as Lessee argues, that the chancellor made "licensure the *sine qua non* of whether Dr. Kolbe had sufficient intellectual capacity and experience to serve as an expert."

qualification of a witness as an expert is a preliminary question for the trial judge.  Tenn. R. Evid. 104(a)(2004); *McDaniel*, 955 S.W.2d. at 263.  The trial court's ruling on the admissibility of "expert" testimony may only be reversed upon a showing that the court's decision was arbitrary or an abuse of discretion.  *McDaniel*, 955 S.W.2d at 263–64 (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1992)); *Lindgren v. City of Johnson City*, 88 S.W.3d 581, 585 (Tenn. Ct. App. 2002)(citing *White v. Vanderbilt University*, 21 S.W.3d 215, 231 (Tenn. Ct. App. 1999)).

The chancellor noted that he was predisposed to admit the testimony of Dr. Kolbe and remarked that Dr. Kolbe's resume and background was impressive.  Yet, in this case, the chancellor found that Lessee had failed to carry its burden in qualifying Dr. Kolbe as an expert in the proposed areas of testimony because the factual bases for the proffered testimony lacked reliability and trustworthiness.  After reviewing the record, there was ample evidence to support the trial court's decision to exclude Dr. Kolbe's proffered expert testimony.

### (5) *Failure to Appoint Special Master*

After the trial on the merits, Lessee filed a motion to appoint a special master to report on the amount of damages suffered by Lessee.  The trial court took no action on this motion, presumably because the court found that Lessee was in breach and consequently was not entitled to damages.

In general, the decision whether to appoint a special master is within the discretion of the trial court.  Tenn. R. Civ. P. 53.01 (2004)("The court in which any action is pending *may* appoint a Special Master therein.").  Lessee argues that the trial court has no discretion in whether to appoint a special master to make a recommendation on the amount of damages.  In support of this argument, Lessee cites *Provident Life & Accident Insurance Co. v. Globe Indemnity Co.*, 3 S.W.2d 1057 (Tenn. 1928).  In *Provident Life*, the Tennessee Supreme Court held that, in cases involving complicated accountings, the matter should be referred to a special master after the basis for the accounting has been determined by the trial judge.  *Provident Life*, 3 S.W.2d at 1058.  Assuming, *arguendo*, that a trial judge is required to appoint a special master to assess damages, here, the chancellor found that Lessee had breached the lease and was not entitled to damages.  Therefore, this issue is moot, as the appointment of a special master would have served no purpose.

### (6) *Trial Court's Exclusion of Deposition Testimony of California Deponents*

On April 1, 1998, Lessor's counsel gave notice to Lessee that it would be traveling to California and taking a number of depositions of Specialty employees, namely Mr. Longoria and Gloria Madsen.  The depositions were taken during the week of April 14, 1998, and Lessee's counsel was present.  After Lessor finished his direct examination of the first deponent, Mr. Longoria, Lessee began questioning Mr. Longoria.  At that point, Lessor's counsel objected to any evidentiary use at trial by Lessee of the deposition testimony of Mr. Longoria.  Lessor's

counsel stated that he had given notice that the deposition was for discovery only and not for evidentiary use. Lessee's counsel stated his understanding that the law made no distinction between a "discovery" deposition and an "evidentiary" deposition. Both parties made a statement for the record, and Lessee's counsel continued questioning. Upon the close of Lessee's questioning of Mr. Longoria, which concluded the following morning, Lessor's counsel did not conduct a redirect examination.

Before the trial, Lessor filed a motion *in limine* to exclude the use by Lessee in its case-in-chief of the deposition testimony of Mr. Longoria and Ms. Madsen . In support of this motion, Lessor argued, *inter alia*, that (1) Lessee failed to give notice of intention to take the deposition of Mr. Longoria as required by Rule 30.02 of the Tennessee Rules of Civil Procedure, (2) Lessor was not given "reasonable notice"of Lessee's intention to use the deposition testimony pursuant to Rule 32.01(3)(B), and (3) Lessor would be denied its right of cross-examination if Lessee were allowed to use the deposition testimony as evidence at trial. Oral argument was held on the matter, and the trial court granted Lessor's motion *in limine*, thus excluding the use of the deposition testimony at trial. Lessee filed a motion to reconsider and memorandum in support thereof, arguing that Tennessee law makes no distinction, with respect to use at trial, between "evidentiary" and "discovery" depositions.

Rule 32.01 of the Tennessee Rules of Civil Procedure governs the use of depositions in court proceedings. Rule 32.01(3)(B) provides in relevant part:

> At the trial . . . any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with the following provisions:
>
> . . . .
>
> (3) The deposition of a witness, whether or not a party, may be used by any party for *any* purpose if the court finds: . . . (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing or is out the state[.]

Tenn. R. Civ. P 32.01(3)(B).

Rule 32.01(3) is the counterpart to the former testimony hearsay exception, Rule 804(b)(1) of the Tennessee Rules of Evidence. *See* Tenn. R. Civ. P. 32.01, Advisory Commission Comment to 1990 Amendment; *see also* Robert Banks, Jr. & June F. Entman, Tennessee Civil Procedure § 8-7(e) (2d ed. 2004). The Advisory Commission Comment to Rule 32.01 further provides that "[e]xcept with respect to some experts, a deposition is admissible as substantive evidence at trial if the deponent is unavailable to give live testimony." Tenn. R. Civ. P., Advisory Commission Comment to 2001 Amendment.

Here, the deponents would clearly meet the standard of "unavailability" for both Rule 32.01(3)(B) of the Tennessee Rules of Civil Procedure and Rule 804(a)(6) of the Tennessee Rules of Evidence, as both deponents resided in California. With regards to Mr. Longoria, however, he appeared and testified at trial. Therefore, the exclusion of his deposition testimony is rendered moot, and if the trial court erred by excluding the use of his deposition, that error, if any, would be harmless error. With regards to the exclusion of Ms. Madsen's testimony, Lessee has not shown the relevance of her testimony, either in its brief, at oral argument or in the court below. Thus, we are unable to determine how Lessee was prejudiced, if at all, by the trial court's exclusion of Ms. Madsen's deposition testimony. *Tompkin v. PhilipMorris USA, Inc.*, 362 F.3d 882 (6th Cir. 2004).

### *Conclusion*

For the foregoing reasons, we affirm the findings of the court below that Lessee breached the lease by failing to cure a number of defaults, of which Lessee was put on adequate notice. We further hold that the trial court did not err in conditioning leave to amend Lessee's complaint upon a trial continuance. In addition, we hold the trial court did not err in excluding Lessee's proffered expert witness's testimony or in excluding the deposition testimony of two California deponents. The trial court's failure to appoint a Special Master was also not error. We do, however, hold that the trial court erred in failing to find that Lessor was required to seek a writ of possession before repossessing the leased premises. However, having further determined that Lessee suffered no damages as a result thereof, the judgment of the trial court is modified to award Lessee nominal damages in the amount of $100.00.

The pivotal issue in this protracted litigation is breach of the lease agreement. The chancellor found Lessee to be in breach, and we concur. While Lessor has not appealed the award of attorney's fees and costs, we will nonetheless address the award since we have determined that the court below was in error in ruling that Lessor could enter the premises without first obtaining a writ of possession.

The lease provides that "in the event of any legal action or suit resulting from any default of this Lease, the prevailing party shall be entitled to receive reasonable attorney's fees." In view of the fact Lessor prevailed on the pivotal issue of breach, we consider Lessor to be the prevailing party, notwithstanding the Lessee's entitlement to nominal damages. Therefore, the award of attorney's fees and costs is affirmed.

Costs of this appeal are taxed to the appellant, 94th Aero Squadron of Memphis, Inc. and Specialty Restaurant Corporation, and their surety.

_____
DAVID R. FARMER, JUDGE