IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 8, 2012

## COURTNEY ANNE THOMPSON v. ROBERT HARRISON THOMPSON, III

**Appeal from the General Sessions Court for Wilson County**
**No. 2010DC118      John Thomas Gwin, Judge**

**No. M2011-02438-COA-R3-CV - Filed October 24, 2012**

The trial court declared the parties divorced, reserving the designation of primary residential parent for their nine month-old daughter. After a hearing the court adopted a parenting plan that designated the father as the child's primary residential parent. The mother argues on appeal that the trial court applied an incorrect legal standard and made a decision contrary to logic and reasoning. We disagree and hold that the evidence does not preponderate against the trial court's findings of fact, and that the court did not err in its application of the facts to the relevant legal principles. Therefore, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court
Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Clayton Michael Cardwell, Nashville, Tennessee, for the appellant, Courtney Anne Thompson.

Gloria Jean Evins, Lebanon, Tennessee, for the appellee, Robert Harrison Thompson, III.

## OPINION

### I. BACKGROUND

Robert Harrison Thompson, III ("Father") and Courtney Anne Thompson ("Mother') married on December 14, 2002. Their only child, Grace Jennifer Thompson, was born on November 23, 2009. In July of 2010, just eight months after their child was born, Mother filed a complaint for divorce in the General Sessions Court of Wilson County, alleging that

the parties' marriage was irretrievably broken because of irreconcilable differences. She submitted a proposed temporary parenting plan that named her as Grace's primary residential parent, and she asked the court to order Father to pay child support and alimony. Father moved out of the parties' home in Mt. Juliet and into a residence in Franklin, near where he worked.

The trial court conducted a hearing on August 5, 2010, to consider Mother's proposed plan. After hearing testimony from the parties and in accordance with their stipulations, the court declared the parties divorced in an order dated September 1, 2010, pursuant to its authority under Tenn. Code Ann. § 36-4-129(a) and (b). The court also declared that it approved the visitation provisions for Father in Mother's temporary parenting plan, and it apportioned the financial obligations of each party.[1] The final designation of the primary residential parent was reserved for further orders of the court. Mother was granted exclusive possession of the marital home, and Father was ordered to pay the monthly mortgage.

Under the temporary parenting plan, Father was awarded parenting time with Grace every week from Thursday at 8:00 a.m. until Sunday at noon. The proof showed that both parties had full-time jobs, so when Mother's maternity leave ended, Grace was regularly left in the care of others. The parties retained a baby sitter to take care of the child during Mother's time at work from Monday to Wednesday, with Father paying the babysitter's charge of $390 per month. Father's parents took care of the child during his Thursday workdays. Father was able to arrange his work schedule so he would have Fridays free to spend with Grace.

On January 18, 2011, Father filed an answer to Mother's divorce complaint and asked the trial court to name him as the child's primary residential parent with standard visitation for Mother. For her part, Mother filed a proposed parenting plan that changed Father's parenting to give him residential placement Thursday to Monday morning, every other week.

The parties subsequently entered into an Agreed Order that settled all of their remaining property issues. Among other things, the order recited that a sale of the marital home was scheduled to close in two weeks and that the proceeds of the sale would be divided

---

[1]Mother's "Motion to Approve Temporary Parenting Plan and for Pendente Lite Child and Spousal Support" asked for child support in the amount of $425 per month in accordance with the Child Support Guidelines. The trial court's order of September 1, 2010 does not contain any direct reference to child support or alimony, but states that it "approves the visitation provisions contained in the Temporary Parenting Plan attached hereto." There is no parenting plan attached to the trial court's order. The record suggests, however, that Mother received regular child support during the period that she acted as the child's primary residential parent. The record also contains a court order dated May 16, 2011, by which Father was ordered to pay spousal support of $275 per month.

equally between the parties after payment of debts. The parties also waived all rights to alimony, and they each agreed to pay their own attorney fees. With the entry of the Agreed Order on August 1, 2011, the only unresolved issue was the parenting plan.

## II. THE FINAL PARENTING HEARING

The final hearing on the parenting plan was conducted over two full days in August, 2011. Mother's testimony shows that she graduated from college with a degree in social work and that her career in that field is very important to her. She worked for two years as a foster care case worker in Texas before beginning her current employment at Court Appointed Special Advocates of Davidson County ("CASA"), where she has worked for the last four years.

Mother was asked about her financial circumstances since the parties' separation. She testified that she found it difficult to pay all her expenses on a salary of $29,000 a year. Mother was asked why she did not apply for a better-paying job with the State, which counsel asserted had openings for applicants with Mother's qualifications. Mother answered that "they very well may, but that's not necessarily where I would choose to work." Mother also testified that she has considered taking a second job to make ends meet. Father's income and expense statement showed that he earned about $83,000 per year at the time of trial. He testified that his job with an engineering company requires him to work about 35 hours a week and offers him a great deal of flexibility.

Mother acknowledged that she had to ask Father to pay for some items for Grace's benefit and that Father had readily responded. She also testified that she sometimes went without lunch so that there was enough money for lunch for Grace. Father testified that he was worried that Grace was not getting enough to eat at Mother's house, and he offered to increase Mother's weekly support, and Mother accepted his offer.

Mother was asked about where she planned to live after the sale of the marital home closed, if she were named Grace's primary residential parent. She testified that she planned to move to Bellevue, in Davidson County, because she has friends in the area, housing is affordable, and it offers a shorter commute to her job in Nashville. She stated that she had searched on-line for a daycare provider in Bellevue and had found one that she thought would be suitable for Grace. She testified that the monthly cost was $923.

When Father took the stand, he testified that he had made significant changes in his life to accommodate Grace's needs. As we noted above, he moved to Franklin when he first separated from Mother. However, he found that maintaining his own separate residence, paying the mortgage on the marital home, and meeting his other obligations put a strain on

his finances. After three months he returned to Mt. Juliet and moved in with his parents.

Photos of their home were entered into the record and showed that ample space is dedicated to the child, and the house is certainly suitable for her. Father testified that he did not plan to remain in his parents' home forever, but hoped someday to be able to build his own home, perhaps on another part of his parents' fifteen acre property.

Father was questioned about his relationship with Grace, and he detailed his interactions with the child, including preparing breakfast for her, getting up in the middle of the night to change her diaper, playing with her, reading to her, taking her swimming, to church, and to the library. He testified that when he comes home from work, Grace runs up to him excitedly, calling out "Daddy, Daddy," and that she kisses him when he picks her up. He further testified that she is much more reserved around Mother. The testimony of the babysitter and of the paternal grandmother was consistent with Father's testimony on that issue. According to Father, he and Mother shared child rearing duties about equally prior to their separation, but that since then he has spent far more time with the child than Mother.

Grace's babysitter, Cynthia Brown, testified that she began providing care for Grace three days a week when the child was only about three months old. Ms. Brown also watches her two grandchildren, and Grace has grown very close to them. Ms. Brown also testified that she keeps a daily log of Grace's activities and her development, and that she offered copies of the log to both parents. Mother said she was not interested. Father accepted the offer and said that he found the logs very useful.

On rebuttal Mother contradicted Father's account of several matters. She also criticized what she saw as bias in the testimony of Ms. Brown and of the paternal grandmother, and she stated that she believed they were conspiring to turn Grace against her and to portray her in a bad light.

The court's decision was announced in a letter ruling, dated August 19, 2011, and memorialized in a final order, filed on August 29, 2011. The court found that Mother and Father were both fit parents and that they both loved their child, but that their personalities were very different. The court then discussed in detail the testimony it heard in light of each of the factors set out in Tenn. Code Ann. § 36-6-106(a) to consider in custody determinations. The court concluded that those factors indicated that it was in the child's best interest that Father be named as her primary residential parent. The court accordingly adopted Father's proposed parenting plan, but with some specific changes that expanded Mother's residential schedule. Mother appealed.

### III. THE STANDARD OF REVIEW

The appellate courts have not been entirely consistent in their expressions of the appropriate standard of review in this kind of case. In it latest statement of the standard in 2005, the Tennessee Supreme Court described it this way:

> [W]e now review the juvenile court's decisions concerning comparative fitness, custody, visitation, and child support . . . . Our standard of review in child custody cases is *de novo* upon the record of the trial court with a presumption of correctness, unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *Haas v. Knighton*, 676 S.W.2d 554, 555 (Tenn.1984).

*In re C.K.G.*, 73 S.W.3d 714, 732 (Tenn. 2005).

That standard was the established standard for a number of years. For example, in the frequently-cited case of *Gaskill v. Gaskill*, 936 S.W.2d 626 (Tenn. Ct. App. 1996) (perm. app. den. Dec. 2, 1997), the court described the standard of review this way:

> Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App.1995). Thus, we review these decisions *de novo* on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Nichols v. Nichols*, 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App.1992).

936 S.W.2d at 631.

As this quotation states, the Supreme Court had stated the standard of review in, *inter alia*, the *Nichols* case:

> This is the standard by which we must abide in reviewing trial court judgments in child custody cases. The review of findings of fact shall be *de novo* on the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise.

*Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990) (overruled on other grounds by *Aaby v. Strange*, 924 S.W.2d 623 (Tenn. 1996) (citing *Haas v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984)) and Tenn. R. App. P. 13(d)).

All roads lead back to *Haas v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984), and, indeed, that is the opinion in which the Tennessee Supreme Court determined the appropriate standard of review, holding that the adoption of Rule 13 of the Tennessee Rules of Appellate Procedure had replaced the older standard for child custody cases, which had been review of the record *de novo* without a presumption of correctness. *Id*. The Court specifically filed the opinion in *Haas* "in order to clarify the scope of review in child custody cases." *Id*. The Court quoted, agreed with, and approved the holding in *Bah v. Bah*, 668 S.W.2d 663 (Tenn. Ct. App. 1983), which stated:

> The matter is to be reviewed by us *de novo* with a presumption of correctness of the ruling of the trial judge. T.R.A.P. 13(d). We are not unmindful of *Riddick v. Riddick*, 497 S.W.2d 740 (Tenn. App.1973), which states that the presumption is eliminated in child custody cases and the review is strictly *de novo*. *Id*. at 742. However, that case was decided prior to the passage of the T.R.A.P. rules and no exception from the normal review in non-jury matters is made therein for custody cases.

However, in 2001 the Supreme Court stated the standard differently, as follows:

> . . . the standard for appellate review of a trial court's child visitation order is controlled by our decision in *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn.1988)[2]. There, we noted that "the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge." *Id*. at 429 (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App.1973)). Accordingly, we held that a "trial court's decision [on visitation]

_____

[2]     Although we recognize that the general rule is that "the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge," *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. App. 1973), and that the trial court's decision will not ordinarily be reversed absent some abuse of that discretion, "in reviewing child custody and visitation cases, we must remember that the welfare of the child has always been the paramount consideration" for the courts. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn.1983).

*Suttles v. Suttles*, 748 S.W.2d at 429.

will not ordinarily be reversed absent some abuse of that discretion." *Id*.

. . .

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). The Court did not indicate that it intended to change the earlier-expressed standard or that it was overruling *Nichols* or *Haas*.

Both the custody statute and the parenting plan statute provide that the court's parenting decision is to be based on the child's best interests. Tenn. Code Ann. § 36-6-404(c)(3). In addition, the court is directed to adopt a residential schedule "consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child." Tenn. Code Ann. § 36-6-404(b).

With those ultimate legal principles in mind, we will review the trial court's findings of fact *de novo* upon the record, accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d at 732. Once the factual findings are made, the trial court's application of the facts to the best interests standard involves the exercise of some discretion. Custody and visitation or parenting plan determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. *Gaskill*, 936 S.W.2d at 631. Although we accord trial courts broad discretion in these decisions, they must still base their decisions on the proof and upon the appropriate application of the applicable principles of law. *Id.* While appellate courts are reluctant to second-guess a trial court's determination regarding the details of a parenting arrangement, *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn.1999); *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004), we will not apply the abuse of discretion standard.

### IV. ANALYSIS

There are currently two different statutes setting out non-exclusive lists of factors for

the trial court to apply to help it reach the goal of determining a child's best interest. Tennessee Code Annotated § 36-6-106 applies to "cases requiring the court to make a custody determination. . . ." Tennessee Code Annotated § 36–6–404 requires that a permanent parenting plan be incorporated into "any final decree or decree of modification in an action for absolute divorce, legal separation, annulment, or separate maintenance involving a minor child." A parenting plan must include a residential schedule, which designates in which parent's home the child will reside on different days, and the court must designate a "primary residential parent." In determining the residential schedule, the court is to consider a list of factors. Tenn. Code Ann. § 36-6-404(b).

The trial court herein applied the factors in Tenn. Code Ann. § 36-6-106(a), which apply to custody determinations.[3] Although the parenting plan statutes are applicable herein, the legislature's list of factors at Tenn. Code Ann. § 36–6–404(b) for the court to consider in determining a parenting plan and residential schedule are substantially similar to the factors set out in Tenn. Code Ann. § 36–6–106(a), and both allow for consideration of any other factors the court deems relevant. In this case, as in most cases, the analysis and the result would be the same regardless of which set of factors is applied. To avoid confusion, we will refer in our discussion to the same set of factors as was applied by the trial court.

The trial court made thorough findings of fact in the context of the relevant statutory factors. In considering "the love, affection and emotional ties existing between the parents and caregivers and the child," Tenn. Code Ann. § 36-6-106(a)(1), the trial court found that while both parents might equally love their child, "Mother is not as openly affectionate

---

[3]The factors set out in Tenn. Code Ann. § 36-6-106(a) are:
(1) The love, affection and emotional ties existing between the parents and child;
(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment ...;
(4) The stability of the family unit of the parents;
(5) The mental and physical health of the parents;
(6) The home, school and community record of the child;
(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person ...;
(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and
(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

towards Grace. As a result, Grace exhibits more emotional ties to Father." This finding is supported by the testimony of Father, his mother, and Ms. Brown. Mother does not dispute that Grace appears to be more loving with Father, but she suggest that this is attributable to a conspiracy by those witnesses to turn the child against her. There is no evidence in the record to support her theory. While the evidence does not preponderate against the court's findings of fact, we are not convinced that the amount of openly-expressed affection is necessarily determinative of a child's love or emotional tie with a parent.

Another factor considered by the trial court is "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . .." Tenn. Code Ann. § 36-6-106(a)(3). Discussing that factor, the trial court found that the evidence clearly preponderates in Father's favor. The proof shows that Father plans to continue a schedule that has provided Grace with consistent and loving care provided by himself, his mother, and Ms. Brown. Mother plans to move to Bellevue and enroll the child in commercial daycare, "if the position is still open," obviously a new environment for Grace.

As to "[t]he stability of the family unit of the parents." Tenn. Code Ann. § 36-6-106(a)(4), the proof showed that Father's parents have been married for 39 years, that they have allowed Father to move back into their house, and that they have been instrumental in the care of their granddaughter on a regular basis. The relationship between Father and his parents is obviously close. In contrast, Mother is admittedly estranged from her own mother and has very little contact with her father. Neither of her parents has taken care of Grace overnight. The trial court found that this factor weighs heavily in Father's favor.

The trial court offered a more mixed analysis of another factor: "Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child." Tenn. Code Ann. § 36-6-106(a)(10). The court stated that "[b]ut for the Father's proposed parenting plan the Court would find that these issues likewise preponderate in favor of Father . . . . The Court finds that Mother's proposed plan, suggesting that Father have much more time with Grace, is indicative of a greater willingness to facilitate a close relationship with Father."

The proof shows that Mother has always encouraged a strong relationship between Grace and Father, and that she has never tried to withhold the child from him. She stated that "I really would like for him to see her every day," and she also testified that in case of an emergency with Grace, her first call would be to Father, because "he's her dad." Father likewise testified that he believed that Grace's relationship with Mother was important, and that he would foster and encourage that relationship and make sure Mother got to spend time

with Grace. Father has also supported Mother's participation in Grace's life in a material way, by making sure she has anything she needs to care for the child.

Father's proposed parenting plan, nonetheless, would have given Mother "standard parenting time," which means every other weekend from Friday to Sunday. It also included only one week of uninterrupted parenting time during the summer, resulting in Mother receiving only 84 days of parenting time each year. Under Mother's proposed parenting plan, she would have been named as the child's primary residential parent, but Father would have received quite a bit more parenting time than he suggested she receive.

In addition to findings on specific factors, the trial court made some general findings regarding the parents. Father was described by the court as a detail person with a controlling personality who had made Grace the focus of his life, while Mother had chosen a lifestyle that "while not directly harmful to Grace, clearly is less focused on the child when compared to Father's focus." The court also found Father's demeanor and credibility at trial to be good, while Mother's demeanor and credibility at trial were "troubling."

The trial court determined that it would be in the best interest of the child to name Father as her primary residential parent, but that his proposed parenting schedule should be modified to give Mother an amount of parenting time comparable to what she proposed that Father receive. The court reasoned that such a schedule would give Mother time to deepen her bond with her daughter. The parenting plan adopted by the court accordingly gives Mother parenting time with the child on alternate weekends from Thursday until Monday, as well as alternating holidays and two non-consecutive seven day periods of uninterrupted parenting time during the summer. The court calculated that its plan would give Mother 131 parenting days with the child, while Father would have the child for 234 days.

Based upon our review of the record, we hold that the evidence does not preponderate against the trial court's findings of fact, and we find no error in the trial court's conclusion that it is in the child's best interest to designate Father as the primary residential parent, nor in its adoption of a parenting plan that encourages a close and continuing parent-child relationship between the child and both parents. We accordingly affirm the judgment.

## V.

The judgment of the trial court is affirmed. We remand this case to the General Sessions Court of Wilson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Courtney Anne Thompson.

_____
PATRICIA J. COTTRELL, JUDGE