IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 29, 2010

IN RE ALEXANDRA J.D.

Appeal from the Juvenile Court for Knox County
No. 11092     Timothy Irwin, Judge

No. E2009-00459-COA-R3-JV - FILED DECEMBER 10, 2010

This is an appeal from the trial court's grant of the father's petition to be named the minor child's primary residential parent.  Finding that the father met his burden to show a material change in circumstances sufficient to warrant the requested modification and that the change was in the child's best interest, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Brandy Boyd Slaybaugh, Knoxville, Tennessee, for the appellant, Natascha D. M.

James S. Sharp, Jr., Knoxville, Tennessee, for the appellee, Kenneth F.[1]

Jere Franklin Ownby, III, Knoxville, Tennessee, Guardian Ad Litem.

**OPINION**

**I.  BACKGROUND**

The minor child, Alexandra J. D. ("the Child"), was born February 20, 2002, to appellant, Natascha D. M. ("Mother").  Mother was not married to the Child's father, appellee Kenneth F. ("Father"). Throughout Mother's pregnancy and the resulting birth,

---

[1]By court order, the child now bears the last name of her father.

Mother resided with James L. M. ("Stepfather"), whom she later married.[2] Approximately nine months after the Child's birth, Mother sued Father to establish paternity and set child support. Such parentage was established shortly thereafter.[3] Father was ordered to pay $72 per week in child support, repay the State of Tennessee for birth costs, and carry health insurance on the minor child.[4] Father is married now to Kayla F. ("Stepmother").[5]

The parties have frequently found themselves at odds and have returned to court on a frequent basis. Numerous motions and responses have been filed in this protracted case. Father filed at least nine motions for contempt when Mother would not allow Father to pick up the Child for his co-parenting time or made the transfer difficult. During one instance, Mother would not answer the door in order to exchange the Child for Father's Christmas visitation. At another time, Mother claimed "she had forgotten about the co-parenting time" and that both she and the Child were sick. Such incidents continued over a four-year span.

At a hearing held on August 13, 2008, the Guardian Ad Litem testified as follows:

In the service of a child . . . I have a duty to look after her best interests and in the broader sense of justice I'm here to argue that the best interest of this child should be the relief sought by the father, that this court should order the father to have custody of this child and that mother should have standard visitation. That's my conclusion. . . .

. . . **There has been a substantial change of circumstances** as Mr. Sharp outlined.

**Since the parental agreement both parties have married, there's new siblings, change of economics,[6] and most importantly even mother will say**

_____

[2]The record reflects that two children have been born to the marriage of the Mother and Stepfather. Mother was pregnant again at the time of the hearing.

[3]According to the record, Mother and Father met "online." The Child was conceived during a relationship consisting of three dates.

[4]Father's payments were actually $85 per week in order to retire an arrearage.

[5]Two children have been born to the marriage of the Father and Stepmother.

[6]This reference relates to the fact that neither Mother nor Stepfather appear to have any significant source of income. Stepfather recently secured a commission-type position with a mortgage company and Mother does not work. The record reveals an attorney was appointed for Mother after she was found to lack

(continued...)

**that this ongoing fight about custody, this raging four-year battle about custody has traumatized the child.** . . .

\* \* \*

My belief is that the mother's love is not . . . the child first kind of love that we want parents to have. It's narcissistic, it's clinging, and it is not good for the little girl. It's all about mother. . . .

\* \* \*

. . . Then there's the character of [Mother]. I say she can't remember certain things. And then she can clearly remember other things. Again and again and again when under oath giving testimony to this court the things that she just cannot remember tend to be the things that she thinks are injurious to her case.

The things she has a crystal memory of are things that she thinks are helpful to her case. **I say that either she has such deep-seated emotional problems that she is divorced from being able to tell what is true and what's not true, what's real and what's not real, or she has repeatedly perjured herself before this court. One of the two**. . . .

\* \* \*

. . . I say that it is most clearly in [the Child's] best interest that she spend the majority of her time in [Father's] household and that she continue to have, of course, . . . contact with the M. household and they have their standard visitation. . . .

(Emphasis added.) Thereafter, the Child was placed in the legal and physical custody of Father. The trial court held as follows:

The Court has jurisdiction in this case pursuant to Title 36 ancillary to a paternity action . . . it's a best interest adjudication.

\* \* \*

---

[6](...continued)
financial resources.

. . . There has been a material change of circumstance since the entry of the original custody order in the child support provision. . . .

The Court's going to award custody of the child to it[s] father . . . The Court's going to denominate him as the legal and residential custodian of the child . . . .

The trial court observed:

the factor found at TCA 36-6-106(a)(5), concerning the mental and physical health of the parents or caregivers substantially is relevant to this controversy and was considered by the Court and **the factor weighs in favor of the father in this action due to the mother's extended history of behavioral health issues** including the mother's admission that she has been diagnosed as being bipolar, anxiety disorder and depression and anxiety or panic attacks **but she is completely leaving these conditions untreated[.]**

(Emphasis added.) The trial court also noted

the factor set forth at TCA 36-6-106(a)(10) regarding each parents['] past and potential for future performance of parenting responsibilities "including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-relationship between the child and both of the child's parents consistent with the best interest of the child" is relevant to this controversy and was considered by the Court and **very significantly weighs for the father here in that the evidence presented, including the testimony of the mother herself, clearly and convincingly evidences that the mother has completely failed to facilitate and encourage a close and continuing parent-[child]relationship between the child and her father and in fact has often acted to hinder that relationship to the child's significant detriment[.]**

(Emphasis added.) All the outstanding petitions filed by the parents were dismissed.

One month later, Father filed a motion for restraining order, asserting that Mother and her husband had "continually harassed, cussed and fussed at the Father and his wife." Six days after the motion for restraining order was filed by Father, he amended his motion, asserting that Mother had left the following message on his family's answering machine:

Hey Kayla you better keep up your meal ticket for little Kenny or he's going to launch a custody case against you. You keep paying for this custody case. You're not going to have any money left for your own custody case you dyke. You're a f--king dyke. You look like a boy, you act like a boy. You['re] huge. You['re] bigger than Kenny is. What's wrong with you? You['re] psychotic and you're a bitch. Are you prepared to go to Hell?

I need to ask you that question again, because you didn't answer.

A permanent parenting plan was agreed upon in September 2008 and filed three months later. A final order making Father the primary residential parent was entered on January 30, 2009. The order of the juvenile judge confirming the findings of the referee was entered on July 20, 2009. Mother thereafter filed a timely notice of appeal.

## II. ISSUES

We restate the issues in this matter to be whether the evidence preponderates against the trial court's finding that there was a "material change of circumstances" affecting the Child's life and justifying a "comparative fitness" analysis pursuant to Tenn. Code Ann. § 36-6-106, and whether the factors in Tenn. Code Ann. § 36-6-106 were decided against the weight of the evidence.

## III. STANDARD OF REVIEW

We review the trial court's conclusions of law under a de novo standard, with no deference to the conclusions made by the lower court. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569-70 (Tenn. 2002); *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). A "review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d).

In applying the de novo standard, we acknowledge that "[t]rial courts are vested with wide discretion in matters of child custody" and that "the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). "Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . .

-5-

proceedings themselves,' appellate courts 'are reluctant to second-guess a trial court's decisions.'" *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)(quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1993)). Appellate courts should only set aside the trial court's judgment in such cases when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

## IV. DISCUSSION

The law is well settled in cases such as these that when a decree concerning a child's primary residential parent and/or residential schedule has been entered, that decree is res judicata and is conclusive in a subsequent application to change the arrangement, unless some new fact has occurred, which fact has altered the circumstances in a material way, so that the welfare of the child requires a change of the original parenting plan. *Long v. Long*, 488 S.W.2d 729 (Tenn. Ct. App. 1972). Thus, once the trial court has made an initial determination with respect to a child's residential schedule, it cannot entertain a subsequent petition to modify that arrangement absent a material change in circumstances, such that the welfare of the child demands a redetermination. *See, e.g., Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995). A "material change in circumstances" justifying modification of a child's residential schedule may include factors arising after the initial determination or changed conditions that could not be anticipated at the time of the original order. *See Blair v. Badenhope*, 940 S.W.2d 575, 576 (Tenn. Ct. App. 1996) (citing *Dalton v. Dalton,* 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993)). If the trial court finds that there has been a material change in circumstances, it will then consider the petition to modify the residential schedule using a "best interest" standard. *McDaniel v. McDaniel*, 743 S.W.2d 167, 169 (Tenn. Ct. App. 1987). *See* Tenn. Code Ann. § 36-6-106.

The pertinent statute specifically provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change of circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to . . . circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B)(2010).

The trial court in the instant case found that there was a material change of circumstances affecting the Child's life: "There has been a material change of circumstances since the entry of the original custody order in the child support provision. [T]he Court does find that there has been trauma to the child related to visitation with the father and that has materially affected the child." In particular, the trial court noted

> [t]hat the evidence indicates that parties' marriages [to other parties after the birth of the Child], and the birth of [the Child's] half-siblings, and the ongoing caustic and volatile and hostile relationship between the mother and father do constitute a material change of circumstances that authorizes this Court to determine the best interests of the child . . . in custody and visitation matters (the Court notes that even the Respondent/mother admits that the hostile relationship between herself and the father has been "traumatic" for the child) . . . .

Mother admitted that she became emotionally upset when it was time for the Child to transition into the visitation with Father. Additionally, she acknowledged that the medical records of the Child's physician indicated that the Child was experiencing physical symptoms as a result of the stress between the parents arising from conflicts about co-parenting time, specifically "dysfunctional voiding worsened by stress of family conflict."

Upon our review of the evidence of the intensely hostile relationship of the parties and the changing situation of Mother after her marriage, we find the record supports the trial court's findings of fact that there has been a material change of circumstances that adversely affected the Child and justified a comparative fitness analysis pursuant to the factors set out at Tenn. Code Ann. § 36-6-106(2010).

- A. Tenn. Code Ann. § 36-6-106(a)(1) – "The love, affection and emotional ties existing between the parents or caregivers and the child . . . ."

The testimony presented to the trial court as to this factor indicated that the Child is happy and bonded at Father's home. Stepfather admitted that Father is a good father, and Mother even recognized that Alexandra runs and leaps into Father's arms when he arrives to pick the Child up. There was also testimony indicating that the Child is bonded with Stepmother and her half-sisters. The trial court found that this factor weighed substantially even for both parents.

- B. Tenn. Code Ann. § 36-6-106(a)(2) – "The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver . . . ."

Even though evidence was presented that Mother was not properly reimbursing Father for her share of the Child's medical expenses, the trial court found that this factor weighed substantially even for both parents.

- C. Tenn. Code Ann. § 36-6-106(a)(3) – "The importance of continuity in the child's life . . . ." and

- D. Tenn. Code Ann. § 36-6-106(a)(4) – "The stability of the family unit of the parents or caregivers . . . ."

The trial court found that these factors weighed evenly for both parents.

- E. Tenn. Code Ann. § 36-6-106(a)(5) – "The mental and physical health of the parents or caregivers . . . ."

The trial court found that this "factor weighs in favor of the father in this action due to the mother's extended history of behavioral health issues, including the mother's admission that she has been diagnosed as being bipolar, anxiety disorder, and depression, and anxiety or panic attacks, but she is completely leaving these conditions untreated. . . ."

Mother gave inconsistent and confusing testimony about her mental health history. At her July 2006 deposition, Mother testified that she used the pain pill Lortab, but she could not tell the court why she took the medication. When she was deposed in March 2007, Mother stated that she had been diagnosed with an anxiety disorder and that she had suffered from it for about 10 years. She also testified that she was having increased panic attacks and indicated her belief that she had in fact been diagnosed with both bipolar disease and depression.

At trial, Mother explained that she believed her psychological symptoms indicated that she is bipolar and among those symptoms she reported was her propensity to react in an exaggerated fashion to situations. She stated that allowing the Child to leave with Father caused her to become "emotionally upset." However, she suddenly claimed that she had only

experienced panic attacks twice. She related at trial that she was first treated by a mental health practitioner in 1999, but could not tell the court for what mental health condition she had been seen. Mother acknowledged that she has had prescriptions for Prozac, Xanax, and Valium for over 10 years, in addition to Lortab.[7]

The evidence presented at trial strongly supports the trial court's findings as to this factor weighing in favor of Father. There was significant proof indicating that behavioral health issues are a troublesome problem for Mother. To the contrary, there was no evidence of any such problems in Father's household.

- F. Tenn. Code Ann. § 36-6-106(a)(6) – "The home, school and community record of the child . . . ."

The trial court found that this factor weighed evenly for both parents, even though the report card for the period that the Child was living with Mother showed that she was absent from school 14 days and tardy an additional 14 times.

- G. Tenn. Code Ann. § 36-6-106(a)(7-8) – the reasonable preferences of the child and evidence of physical or emotional abuse.

The trial court found that these factors were not applicable because the Child is bonded to both parents and is too young to have a reasoned preference regarding custody and there is no evidence of intentional physical or mental emotional abuse.

- H. Tenn. Code Ann. § 36-6-106(a)(9) – "The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child . . . ."

The trial court found that this factor weighed evenly for both parents.

- I. Tenn. Code Ann. § 36-6-106(a)(10) – "Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and

---

[7]Mother stated that inconsistent statements made in her depositions are because she did not understand "what a deposition is."

> caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents . . . ."

The trial court found that this factor was relevant, and noted

> the factor . . . very significantly weighs for the father here in that the evidence presented, including the testimony of the mother herself, clearly and convincingly evidences that the mother has completely failed to facilitate and encourage a close and continuing parent- [child] relationship between the child and her father, and in fact has often acted to hinder that relationship to the child's significant detriment. . . .

Although she denied the fact at trial, at her July 2006 deposition, Mother admitted that she made derogatory comments about Father in front of the Child – specifically that he was "only" the biological father of the Child.[8] She ignored a court order that the Child's last name shall be "F_____" (Father's last name) claiming that she did not understand the order. On numerous occasions, she wrongfully deprived Father of his visitation – this court finds particularly revealing the occasion when Father was knocking on Mother's front door for a custody transfer and Mother went out a side door with the Child and left in her car for lunch. Mother further acknowledged that she would, on occasion, take approximately 20 minutes from the time Father showed up to pick up the Child before he actually received her. She described Father's visitation as "punishment for me for her to be away from home." She also admitted that she cut off all communication with Father's household, would not return telephone calls, and blocked his e-mails. Stepfather testified that "for a long time it was like World War III when these parties got together to exchange children." Mother also sought orders of protection against Father. In a hearing before a Special Master, the following findings were made:

> The testimony of [Mother] . . . was frequently evasive and her allegations unsubstantiated. The allegations of [Mother] are vague at best and totally absent of any framework in time. . . .
>
> . . . [Mother] feigns some sort of unsubstantiated memory loss because she was thinking about going on vacation.

---

[8]Mother claimed at trial that the court reporter at the deposition possibly wrote down her testimony incorrectly.

* * *

To summarize, [Mother] . . . has not proven, by any preponderance of the evidence, that there has been a threat of violence made against her by [Father], that there has been an act of violence by the Respondent, that there has been any destruction of property, that there has been any holding against her will or placing her in fear for her safety. There has not been any evidence of stalking; there has not been any evidence of harassment.

[Mother], your Petition comes very close to an abuse of process . . . .

After reviewing the record, we conclude that the evidence does not preponderate against the findings of the trial court that the statutory factors favor Father as the primary custodian of the Child. The trial court properly conducted a comparative fitness analysis in light of the circumstances as they existed at the hearing. We find no abuse of discretion on the part of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed. This cause is remanded to the trial court for enforcement of its judgment and the collection of costs assessed below. Costs on appeal are assessed to the appellant, Natascha D. M.

_____
JOHN W. McCLARTY, JUDGE