IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 22, 2013 Session

## JAMES LYLE GRAHAM v. BARBIE PHYLISSA GRAHAM

**Appeal from the Circuit Court for Greene County**
**No. 05CV719    Hon. Kindall T. Lawson, Judge**

---

**No. E2012-00416-COA-R3-CV-FILED-MARCH 21, 2013**

---

This post-divorce appeal concerns an agreed-upon parenting plan, which designated Father as the primary residential parent and denied Mother any form of visitation with the Child. Years after the plan was entered, Mother filed a petition to modify the plan, alleging that a material change in circumstances had occurred. The trial court agreed and provided Mother with liberal visitation. Father appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Robert L. Jackson and Elizabeth A. Garrett, Nashville, Tennessee, for the appellant, James Lyle Graham.

Barbie Phylissa Graham, Greeneville, Tennessee, pro se.

## OPINION

## I.  BACKGROUND

Barbie Phylissa Graham ("Mother") and James Lyle Graham ("Father") were married on July 30, 2004. This was Father's first marriage and Mother's second. Mother had one child ("Son") from her previous marriage to Jerry Burger. Shortly after Mother and Father (collectively "Parents") learned that Mother was pregnant with the Child, Father learned that Mother had stolen money from Beatrice Broyles. Father reimbursed Ms. Broyles and filed for divorce. Parents finalized the divorce after the Child was born on April 15, 2006.

It was later discovered that in addition to stealing from Ms. Broyles, Mother had embezzled money from her employer, Asbury Child Enrichment Center ("Asbury") and had forged documents in an effort to secure a higher-paying position with Asbury. After Mother was fired, she attempted to attain a position with the Greene County School System ("Greene County") by submitting more forged documents. Mother was not hired by Greene County.

Parents entered into a marital dissolution agreement and were divorced on July 19, 2006. The parenting plan designated Father as the primary residential parent but did not allow for the Child's visitation with Mother. Despite the agreement, Mother lived in the home with Father, the Child, and Son[1] until November 9, 2009. Approximately one month later, Mother filed a petition to modify the parenting plan and to set visitation. Parents reached an agreement for limited visitation during the pendency of the hearing.

Lengthy hearings were held on Mother's petition over the course of several months. Mother testified that she had never been charged with any type of criminal offense prior to her relationship with Father, who was physically abusive throughout their relationship. She said that her first pregnancy with Father resulted in a miscarriage and that she had two additional miscarriages before becoming pregnant with the Child. She related that the miscarriages "strained" their relationship and "drastically" increased their medical debt.

Mother acknowledged that she committed a multitude of crimes, namely forging Ms. Broyles's checks in 2005, embezzling money from Asbury in 2006,[2] and forging checks that belonged to family members in 2010. Father reimbursed Ms. Broyles.[3] Mother received diversion for the embezzlement charges but was placed on probation after she served 70 days in jail for the 2010 forgeries. She explained that she forged checks in 2010 because she needed to pay attorney fees for the custody dispute. She recognized that her misdeeds hurt the Child but complained that Father should not have told the Child that she was in jail.

Mother also acknowledged that she deceived her employers, co-workers, family members, the court system, and potential employers. She admitted that in order to attain an advanced position with Asbury, she embellished her resume and submitted a forged diploma. She explained that Father "wanted [her] to have that position" and that she wanted to appease him. She admitted that she lied to Father and others by telling them that she was pregnant with twins. She acknowledged that she had several baby showers in which family members

---

[1]Son spent approximately half of his time with Mother and the remaining half with Mr. Burger.

[2]Ivy Leonard testified that she discovered the Asbury embezzlement.

[3]Kenneth Miller, a bank manager at First Tennessee Bank, confirmed that Father reimbursed Ms. Broyles.

and co-workers gave her gifts for twins. She explained that Father wanted her to have twins and claimed that Father would have learned the truth if he had attended any of her prenatal appointments. She admitted that she told Father that she had health insurance through Asbury even though she did not have health insurance. She admitted that she lied on her application for diversion by stating that her medical doctors believed that she had a "mental nervous breakdown," was in need of "extensive therapy," and was raised by an abusive father. Lastly, she identified employment applications that she submitted to Greene County in 2006. She admitted that in her applications, she forged her sister's signature on a reference form and certified that she had a college degree.

Mother alleged that after her unlawful actions were uncovered, Father's violent behavior increased. He initially asked her to have an abortion but then filed for divorce. He told her that if she allowed him to retain custody of the Child, they would never tell anyone about the divorce. She stated that after the divorce, they lived together as husband and wife. She continued to feed, bathe, and care for the Child. She also cleaned the house and prepared meals. She claimed that she was under Father's complete control and that he dictated the Child's schedule. Father often forced her to leave the house, but she always returned.

Mother testified that in December 2006, she ingested 25 Tylenol PM pills. She related that the night before, she and Father had an "ugly dispute." The next morning, she took Son to school and the Child to her paternal grandmother's house before taking the medication in a motel room. When she returned home, Father took her to a hospital. She recalled that her face and nose were "swollen" and that her lip was "busted." She initially denied that she had been abused but when pressed, she told the crisis worker, William Nagy, Ph.D., the truth. She refused help because she did not want to leave the Child.

Mother lived with Father until November 9, 2009, when he forced her and Son to leave the house. She claimed that she left because she believed Father might hurt her or Son if they refused. She explained that Father was intimidating and often carried weapons. After she filed the petition to modify the parenting plan, she and Father reached an agreement, providing for supervised visitation through the Child's school and limited telephone contact. She testified that when she was allowed to visit the Child, the "visits always went well." She asserted that after several months of visitation through the school, Father transferred the Child to a different school. She resumed visitation when the Child was enrolled in a new school several months later. She complained that in addition to impeding her visitation, Father interrupted her telephone conversations with the Child. She alleged that Father had not been cooperative since her last visit with the Child in September 2011. She insisted that she was not a flight risk and alleged that she signed a lease for a house that had room to accommodate the Child and had also obtained employment.

Teri Myers testified that Father dated her friend, Cynthia Cobble, in the early 1990s. She recalled that she was at a family member's house when Ms. Cobble arrived and asserted that Father was following her. She stated that shortly after Ms. Cobble arrived, Father tried to break into the house. She claimed that when she left the house, Father threatened her.

Ms. Myers also testified that when she arrived at the courthouse to provide her testimony, she saw Father, who said, "Be careful." She related that she believed Father was trying to intimidate her. Ashlee Shirey testified that she arrived at the courthouse with Ms. Myers but did not hear Father say anything to her or Ms. Myers.

Ms. Shirey testified that she loaned Mother money and that Mother was making payments to fulfill the loan. She recalled that Father advised her to sue Mother and stated that her suit would aid him in his custody case. She ignored Father's advice and simply adhered to the agreement she reached with Mother for the repayment of the loan.

Mother's sister, Rita Davis, testified that Mother told her that Father was abusive. She recalled that she retrieved Mother from the house "several times" and noticed that Mother had bruises on her chest, arms, and face. She claimed that she did not learn about the divorce until November 2009. She identified Mother's application for employment to Greene County and asserted that Mother had signed her name on the reference form without permission.

Teresa Carver testified that she knew Mother because their sons attended the same school. She and Mother were "really close" during that time, but she did not learn about Mother's divorce until 2009. She stated that in the waiting room of her doctor's office, Father told her about the divorce and custody case and spoke poorly about Mother. She felt "disgusted" by the conversation because she believed Mother was a "very sweet lady."

Barbara Shelton testified that she had known Mother for approximately 35 years and that she had observed Mother with Son. She believed that Mother was "a very good mother." She admitted that she loaned Mother a large sum of money in 2010 because she believed Mother needed money until a divorce settlement arrived. She insisted that Mother was faithfully submitting payments but acknowledged that Mother had submitted a check that did not clear for payment on the loan. She claimed that Father advised her to sue Mother. Instead, she purchased Mother's home from the bank as collateral.

Sandy Gammon testified that she was the administrator of Noah's Ark Day Care and Preschool while the Child was in attendance. She recalled that the Child was "very quiet" when first enrolled at the school but that the Child had "really come out and blossomed" by the time the Child left. She asserted that Mother and Father were "very involved" but that Mother "usually" transported the Child to and from school until November 2009. She

recalled that Mother was "very natural around children" and that Mother "seemed to have a really strong relationship" with the Child. She admitted that despite the Child's attachment to Mother, she did not see a "big difference" in the Child in November 2009. She stated that when Mother visited the Child during the school day, the visits were "very hard" on the Child, who was excited to see Mother but would then cry when Mother left.

Ms. Gammon testified that while her interaction with Mother was normal, Father made her uncomfortable. She recalled that Father became angry when he observed the Child outside without a coat and when he learned that the Child had been bitten by another child. Father also asked her to end Mother's visitation privileges, but she refused. She claimed that she eventually gave Father a letter of dismissal because of his behavior. When Father promised to improve his behavior, she allowed the Child to resume her schooling on a probationary period. She assured Father that Mother's visits with the Child were supervised in order to ensure that Mother did not harm the Child or flee with the Child. She acknowledged that Mother had told her that Father was abusive.

Cathlyn Cannon, a mental health consultant, testified that she administered two tests to Mother in an effort to ascertain her parental fitness. She related that she was prevented from observing Mother's interactions with the Child because of the visitation agreement in place at the time. Her report provided, in pertinent part,

> [Mother] does not display any indications of emotional or psychological dysfunctioning at this time. No psychological diagnoses were presented by the two specific sensitive psychometric instruments requested in the mediated agreement, or by the clinical interview. Her depressive disorder is well under control, and she remains compliant with treatment. Thus, her depressive disorder does not present a sufficient reason to consider her a flight risk, or to question her parenting abilities. She consistently demonstrated in the testing instruments and interview that she attempts to avoid conflict with significant others in her life. She may not have the assertive strength to cope with [Father's] forceful personality. She repeatedly described physical and verbal abuse in her counseling notes. [Father] has consistently "called all the shots", controlling the contact between [Mother] and [the Child], including her family contacts at holidays.

> There is unequivocally no clinical or rational reason to continue the separation and restrictions upon this mother and child. There is no need for any delay in reuniting this mother and child. At least 50/50 time with each parent is recommended. The emotional distress upon the child for the forced separation

from her mother is a factor that has not been addressed, and was not provided for this evaluation.

> Based on the clinical finding of [Mother's] evaluation, and the continued concerns presented regarding [Father's] issues of complete control of the [C]hild, and alleged mistreatment of [Mother], I would advise reunion of the [C]hild and [Mother] immediately. I would also recommend a complete psychological evaluation of [Father], acceptably with the same psychometric instruments requested of [Mother]. The completion of this evaluation is not a tool to delay reunification of [Mother] and [the Child].

She admitted that her report was based upon Mother's testimony but claimed that if Mother's assertions were untrue, her opinion would remain unchanged. She explained that the pertinent tests did not show that Mother had "any psychopathology" or a "distorted or pathological thought pattern." She noted that Mother parented a child and maintained an amicable relationship with Mr. Burger.

Dr. Nagy testified that he was the crisis response therapist for Frontier Health and that he examined Mother on the night of December 7, 2006. He recalled that Mother had attempted suicide and had already been medically cleared even though her face was red and swollen, one of her eyes was swollen, her lips were split, and her nose was bloody. Father showed him an auxiliary police officer badge and a gun and said she fell down the stairs. Father refused to leave the examination room and continually interrupted Mother in an intimidating manner. When Father finally left, Mother confided that Father abused her. He offered her information regarding a battered women's shelter, but she refused help. He released Mother, with the understanding that Father, as her husband, had verbally agreed to observe her every five minutes and ensure that she attended outpatient treatment. He insisted that he would not have allowed Mother to leave with Father if he had known that they were not legally married. He alleged that Father represented himself as Mother's husband.

Rebecca Morrison, a pediatric nurse practitioner, testified that she worked at Kids First Pediatric Office. She recalled that Father and his mother brought the Child to the office for a follow-up appointment on December 23, 2009. She claimed that Father refused to wait with the Child in the room designated for sick children and that Father was upset, prompting her to note that he was belligerent when she arrived in the examination room.

Son, who was 19 years old at the time of trial, testified that he had graduated from high school with good grades, had never had any disciplinary problems, and maintained full-time employment. He stated that since the time of Mother's divorce from his father, he spent half of his time with Mother and the other half with his father. Relative to the Child, he

testified that Mother bathed her, fed her, rocked her to sleep, and took her places. He claimed that Father never performed these tasks for the Child. He stated that he also had a good relationship with the Child and that he hoped to reestablish visitation with her.

Son testified that at times, Mother and Father argued. He claimed that Father was "pretty aggressive" and often carried weapons. He believed that Father emotionally abused Mother. He recalled that Father often forced Mother to leave the house and would not allow her to bring the Child with her. He was present on November 9, 2009, when Father forced Mother to leave the house for the last time. He recalled that Father tried to tell him about Mother's legal problems and was aggressive toward him when he defended Mother. He stated that he grabbed a broom to defend himself because Father came toward him in a threatening manner. He acknowledged that he threatened Father as he left the house.

Mr. Burger testified that he and Mother divorced when Son was approximately three years old. He claimed that despite his marital difficulties with Mother, he was able to cooperatively raise Son with Mother. He believed that Mother had been an "excellent" mother to Son and had always encouraged Son.

Alice Chamberlain and Ruby Elaine Smith testified that they worked at Asbury with Mother and described her as "loving" and as a "very kind, nurturing, sweet, soft spoken, mild mannered[,] extremely patient" person. They did not believe that she was a danger toward children. Ms. Smith testified that she allowed Mother to care for her children on occasion and would continue to allow Mother to care for her children. They acknowledged that Mother embezzled money and engaged in dishonest behavior but insisted that her unlawful activity did not change their opinion. Ms. Chamberlain recalled that she observed bruising on Mother's neck and that Mother claimed that Father choked her. Ms. Smith recalled that Father refused to allow Mother's family to accompany her to the hospital when the Child was born. Ms. Smith did not learn about Mother's divorce until 2009.

Reverend John Daugherty testified that he and Father had been friends for more than 40 years. He supervised a visit between the Child and Mother in September 2011. He claimed that the Child "did not want to go" and that Father convinced the Child to visit Mother. He admitted that the Child went with him and that the visit was "fairly normal." He stated that before they left, the Child gave Mother a hug and kiss. He acknowledged that he never observed any behavior that would cause him concern for the Child's safety.

Reverend Daugherty testified that Father divorced Mother in an effort to protect the Child's "financial future." Despite the divorce, Father allowed Mother to remain in the home and have a relationship with the Child. He recalled that Mother often left the house on a regular basis for extended periods of time without reason. He expressed concern about

Mother caring for the Child without supervision because he thought she might abscond with the Child. He claimed that Mother was quite successful in her attempt to deceive him and his wife and had the unique capacity to deceive people and forge documents.

Kelley Roberts, a teacher, testified that she taught the Child during the 2010-2011 school year. She believed that the Child's "self-esteem" had improved since Mother's visitation ceased. She said that the Child was "no longer distracted and troubled after lunch," was "more focused and attentive," and was "socializing better with peers." She conceded that at first, the Child was disappointed and distracted when the visits ceased but that the Child eventually resumed her normal activity with the other children.

Stephanie Strange testified that she owned a childcare business and had hired Mother as an employee in October 2008. She stated that Mother failed to submit the necessary paperwork for a background check and that when she asked her for the documents, Mother submitted forged documentation. She said that Mother admitted to the forgery and finally submitted valid documentation. She recalled that Mother claimed she was a teacher at Asbury and knew Spanish. She later learned that Mother did not know Spanish. She became concerned when Mother's attitude changed. She related that Mother appeared to be "unstable" and occasionally would "just blow up" in front of the children. She said that Mother left in August 2009 and did not return. She alleged that Mother defamed her and asked her clients to attend Mother's new facility. She believed that Mother was incapable of caring for children, was dangerous, and had a difficult time controlling the Child.

Gordon Britton testified that he was working at Northside Emergency Hospital when Mother was a patient in December 2006. He related that if physical abuse had been alleged, the proper procedure would be to contact law enforcement. He stated that he spoke with Father, who did not appear to be angry but simply seemed concerned about Mother.

Amanda Waddell, the Director of Career Development at Asbury, testified that she fired Mother for resume fraud on March 15, 2006. She later discovered that Mother had embezzled money that was intended for a child that attended Asbury. She explained that the child's mother had died from cancer and that the money was submitted by a donor to Mother as payment for the child's tuition. She related that she was afraid of Mother and would not let her near her children. She stated that Asbury issued a restraining order against Mother, prohibiting her from visiting the campus. She suspected that Mother had returned to the campus and falsified documents for the purposes of securing future employment.

The parties stipulated that Ronnie McAmis and Samantha Ramsey would testify that Mother stole checks from them and forged their signatures in 2010. Mr. McAmis believed that Mother should not be allowed to care for the Child because of her dishonest behavior.

Ms. Ramsey recalled that Mother entered her bedroom and stole the checks while she attended to her baby in the nursery.

Lynette Hill, who worked as the Director at Asbury from 2000 to 2005, testified that Mother told her that Father was abusive. She stated that she confided in Mother that she had difficulty conceiving a child. She believed that Mother re-circulated the story as her own story. She believed that Mother was unstable and would not allow Mother near her daughter.

Special Agent Douglas Allen, who was employed by the United States Secret Service, testified that he met Father two years ago and had been to Father's home. He related that he and Father were friends and that he had no concerns about associating with Father. He believed that Father was a "nice guy" and "stand-up person." He had observed him with the Child and found him to be a loving father that cared for the Child. Likewise, Linda Gass, a special education assistant for Greene County, testified that she observed the Child run to Father after the Child received her diploma at pre-kindergarten graduation.

John Jones, Chief Deputy of the Greene County Sheriff's Department, testified that he worked with Father, who always acted in a professional and restrained manner in his position as an auxiliary police officer. He said that Father had a good reputation for honesty and that he had never seen Father lose control. He claimed that Mother had alleged Father was stalking her but that he was unable to confirm her allegations.[4] He was present when Father viewed the videotape of Mother depositing a forged check with Son in the car.

Thomas Schacht, Psy. D. testified that in his assessment as to whether Mother was capable of parenting the Child, he reviewed documents, observed the Child with Father, observed the Child with Mother, and reviewed a home study completed by his social worker. He found that Mother suffered from an impulse control disorder as evidenced by her struggle with bulimia and her criminal behavior. He stated that those who suffer from impulse control disorder often have a high incident of "intermittent explosive disorder, which is unaccountable inappropriate expressions of anger and rage." He suspected that Mother had possibly attempted suicide on more than one occasion. He believed that Mother's "capacity to exercise mature judgment was severely impaired," that she had a "severe impairment in her capacity for moral reasoning," that she did not have the capacity to relate to the Child throughout the Child's development, that her behavior created a risk of harm to the Child, and that she was capable of "tremendous self deception" and was unable to recognize her behavior as harmful. He related that Mother also had an unrealistic expectation of her ability

---

[4]Detective Lieutenant David Crum, a detective with the Greeneville Police Department, likewise testified that Mother's complaints against Father were unfounded. He related that Mother associated with Wanda Johnson, who had pled guilty to theft for charges relating to a forgery of checks.

to share parental responsibilities with Father. He stated that despite his findings, he did not believe that prohibiting contact between the Child and Mother was appropriate. Instead, he believed that any visitation between the Child and Mother should be supervised.

Dr. Schacht testified that Ms. Cannon's assessment of Mother was limited and potentially misleading. The tests used were susceptible to presenting the subject in an overly positive manner because the tests relied upon Mother's presentation of herself. He also stated that Ms. Cannon should not have issued a custody determination because to issue such a determination was "clearly outside the parameters of accepted professional guidelines."

Michael Marsh stated that Mother rented an apartment from him. Despite Mother's claim in the discovery process, he stated that Mother had never worked for him.

Father testified that he was self-employed and had obtained a Bachelor's Degree in Engineering. He was also the community representative for Head Start and was an auxiliary police officer. He stated that he first learned Mother was pregnant in 2005 and that she subsequently claimed that she was pregnant with twins. After he learned of the pregnancy, a bank representative informed him that Mother had stolen from Ms. Broyles. He said that when he confronted her about the theft, she claimed that Ms. Broyles had borrowed money from her and was slowly paying her back. When he pressed her about the details, she left the house. He confirmed that Mother eventually admitted that she had taken money from Ms. Broyles and that he reimbursed Ms. Broyles in an effort to help Mother.

Father testified that approximately one month before the Child was born, Mother claimed that she was on leave from Asbury and had miscarried one of the twins. He later learned that Mother had been dismissed from Asbury and was never pregnant with twins. After the Child was born, he finalized the divorce but allowed her to stay in the house. He explained that he wanted to help her, while ensuring that the Child was safe. He alleged that Mother agreed to the terms contained in their agreement, knowing that she was not legally entitled to visitation. He related that the agreement they reached concerning her living situation was "temporary" and that she agreed to move once she had enough money.

Father testified that the divorce was finalized in July 2006, that Mother attempted suicide in December 2006, that she was indicted for theft days after the suicide attempt, and that she attended a hearing for the theft charge in January 2007. He claimed that after the hearing, she signed his name on an unauthorized check for $2,700. He asserted that Mother often stole money from him and used his money as proof of employment.[5]

---

[5]Mother asserted that she had worked for Father and that the checks were payment for her employment.

-10-

Father claimed that Mother was more concerned about herself than the Child. He stated that Mother often left the house for long periods of time even though her absence upset the Child.[6] He denied the allegations that he ordered her to leave the house. He claimed that he and Mother shared the household and child-rearing duties and that he and Mother did not share a bedroom after the divorce. He denied Mother's assertion that he held himself out to be her husband when he took her to the hospital in 2006. According to him, he informed everyone that they were divorced and was never in the examination room with Dr. Nagy. After the suicide attempt, he ensured that Mother was constantly supervised when caring for the Child because he was fearful that Mother would kill the Child and then kill herself.

Approximately one year after she attempted suicide, Father believed Mother had slightly improved. At that point, he allowed Mother to care for the Child, to an extent. He stated that Mother's interaction with the Child was still limited because the Child was attending school. He asserted that in May 2009, Mother left the house after she hit him in front of the Child. He alleged that in November 2009, they had one final confrontation that ended when Mother left and never returned. He asserted that the Child did not miss Mother.

Father alleged that he was concerned that Mother might flee with the Child. He noted that Mother had stolen money from him and others, that she was not employed, that she had sold her house and bought a car, and that she had the ability to forge documents. He was concerned about Mother's stability and ability to provide for the Child. He claimed that the Child had been physically hurt on at least one occasion when left unsupervised with Mother.

The trial court held that a material change in circumstance had occurred when Parents ignored the terms of the parenting plan and lived together with the Child as they had before the divorce and that another material change occurred when Mother was "essentially and abruptly removed" from the Child's life in November 2009. The court noted,

> [Mother] has offered numerous credible witnesses that show that she has raised [Son] without incident or concerns; that she ha[d] been the primary parent for [the Child] in this matter without incident or concern; that she ha[d] worked with numerous children, including infants without any problems. She ha[d] always been a good, loving and competent caregiver for her children as well as many other children including infants over a period of at least [19] years. The [c]ourt finds no creditable evidence that [Mother] ever harmed a child or was accused of doing so.

---

[6]He claimed that the Child thanked him for not leaving her.

The court acknowledged Mother's criminal conduct but found that her conduct, even though despicable, did not change the fact that Mother loved her children and had always been a sound caregiver for them. The court held that the "greater weight of the evidence show[ed] that she would continue to be a good mother." The court performed a best interest analysis before designating Father as the primary residential parent but holding that Mother should have "liberal unsupervised visitation" with the Child. A permanent parenting plan that provided for 140 days of visitation with Mother was submitted for entry and subsequently adopted by the trial court. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether the trial court erred in finding that a material change in circumstances necessitated a modification in the permanent parenting plan.

B. Whether the trial court erred in modifying the permanent parenting plan.

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

In matters of divorce and child custody, trial courts are vested with broad discretion, and appellate courts will not interfere with the trial court's decision except upon a showing of erroneous exercise of that discretion. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997). "'Because [c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings,'" appellate courts "are reluctant to second-guess a trial court's decisions.'" *Hyde v. Amanda Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct.12, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).

-12-

## IV. DISCUSSION

### A.

Father asserts that the trial court erred in finding that a material change in circumstances occurred when Mother left Father's residence. He claims that Mother's absence was a reasonably anticipated circumstance when the initial custody determination was entered. He acknowledges that Mother's eventual absence from the home took longer than anticipated but argues that her constant presence was always meant to be temporary. Mother responds that the trial court did not err in finding that a material change in circumstances occurred when Mother was permitted to live with Father and the Child and when Mother was subsequently ejected from the home years later.

"A custody decision, once final, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made." *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 246 S.W.2d 93, 95 (Tenn. 1952)). However, because the circumstances of children and parents change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." *Scofield*, 2007 WL 624351, at *2 (citing Tenn. Code Ann. § 36-6-101(a)(1)).

Modification of an existing custody or visitation arrangement involves a two-step analysis. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). "There are no hard and fast rules for when there has been a change of circumstances sufficient to justify a change in custody." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug.22, 2008) (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003)). However, to determine whether a material change in circumstances has occurred, the court should consider whether:

> (1) the change occurred after the entry of the order sought to be modified; (2) the changed circumstances were not reasonably anticipated when the underlying decree was entered; and (3) the change is one that affects the child's well-being in a meaningful way.

*Cosner*, 2008 WL 3892024, at *4 (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002)). The determination of whether a "material change of circumstances" has occurred requires a different standard depending upon whether a parent is seeking to modify custody (i.e., change the primary residential parent) or modify the residential parenting schedule.

-13-

Tenn. Code Ann. § 36-6-101(a)(2)(B), (c).   The Tennessee Code establishes a lower threshold for modification of a residential parenting schedule.  *Scofield*, 2007 WL 624351, at *3.   Here, the trial court rejected Mother's request to modify custody but modified the residential parenting schedule. Thus, the lower threshold applies.   The Code provides,

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(C).

In this case, Parents never adhered to the parenting plan.  Parents did not agree on much throughout the trial but each agreed that Mother, whether supervised or unsupervised, was a constant presence in the Child's life, despite the agreement reached in the initial parenting plan that was adopted by the trial court.  Child became accustomed to Mother's presence and was upset by Mother's absence.  Each change, Mother's constant presence and then subsequent absence, affected the Child's well-being in a meaningful way and necessitated a change in the residential parenting schedule that was in the best interest of the Child.  Accordingly, we affirm the court's decision that a material change in circumstances occurred when Mother remained in the home after the entry of the parenting plan *and* when Mother left the home after years of liberal visitation with the Child.

B.

Having concluded that Mother presented sufficient evidence to establish that a material change in circumstances had occurred, this court must now consider whether the trial court erred in modifying the parenting plan.  Father asserts that the trial court failed to consider and articulate the relevant and applicable factors.  He asserts that Mother's behavior and diagnosis prevent her from providing financial security, from fostering the Child's emotional and moral development, from providing encouragement, and from assisting the Child in developing and maintaining appropriate relationships.  Mother responds that the court did not err in modifying the residential parenting schedule.

-14-

In modifying a residential parenting schedule, the trial court must determine whether a change in visitation is in the best interest of the child. *In re J.C.S.*, No. M2007-02049-COA-R3-PT, 2008 WL 2924982, at *6 (Tenn. Ct. App. July 28, 2008). This determination requires consideration of a number of factors, including those set forth at Tennessee Code Annotated section 36-6-106(a) to make an initial custody determination and those at Tennessee Code Annotated section 36-6-404(b) to establish the residential schedule. *Id.* Trial courts are not required to articulate each and every fact and its application in custody cases. *See Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010) (stating that "while the statute requires the trial court to consider all the applicable factors, there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination"). However, the court *must* make a best interest analysis to determine which parent is comparatively more fit. *Id.*

We acknowledge that the record does not reflect that the trial court articulated each relevant factor and assigned weight to each factor. Such is not required. The record does reflect that the court spent an inordinate amount of time entertaining each parent's testimony and arguments before conducting a best interest analysis. In this case, Parents submitted *exhaustive* and at times, duplicative evidence of the other parent's moral depravity and inability to properly care for the Child. Mother alleged that Father was abusive and vindictive, while Father alleged that Mother was incapable of accepting responsibility for and improving her criminal and deceitful behavior that affected the Child. Notably, the court appeared to agree with each parent's assessment of the other but found that the Child's maintenance of a relationship with each parent was in the Child's best interest. We agree. Each parent in this case has shortcomings; however, the Child will benefit from the continued nurturing that Mother provided after the divorce and the continued stability that Father provided. Accordingly, we affirm the decision of the trial court and the adoption of the permanent parenting plan, requiring liberal visitation with Mother.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, James Lyle Graham.

_____
JOHN W. McCLARTY, JUDGE

-15-