# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
February 5, 2014 Session

## ELISHA MICHELLE (CANTRELL) DICKERSON v. JOHNATHAN BRADLEY CANTRELL

### Appeal from the Circuit Court for Hamilton County
No. 10D1559A    Hon. Jacqueline S. Bolton, Judge

---

### No. E2013-01732-COA-R3-CV-FILED-MAY 16, 2014

---

This post-divorce appeal concerns the modification of a parenting plan designating Mother as the primary residential parent and awarding Father reasonable visitation. Father filed a petition to modify, claiming that a material change in circumstances necessitated a change in the parenting plan. Following a hearing, the trial court designated Father as the primary residential parent and awarded Mother visitation. Mother appeals. We affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Charles G. Wright, Jr., Chattanooga, Tennessee, for the appellant, Elisha Michelle (Cantrell) Dickerson.

Linda B. Hall, Soddy Daisy, Tennessee, for the appellee, Johnathan Bradley Cantrell.

## OPINION

## I. BACKGROUND

The Child at issue was born of the marriage between Elisha Michelle (Cantrell) Dickerson ("Mother") and Johnathan Bradley Cantrell ("Father"). Mother and Father (collectively "the Parents") divorced in February 2011. Pursuant to agreement, Mother was designated as the primary residential parent, while Father enjoyed reasonable visitation and

was tasked with remitting child support. The relationship between the Parents was contentious, at best.

The agreement remained in place without controversy until February 2013, when David Dickerson ("Grandfather") and Peggy Dickerson ("Grandmother") (collectively "Grandparents") filed a petition for custody of the Child, alleging that the Child was dependent and neglected. The petition provided, in pertinent part,

> [The Child] is a dependent and neglected child within the meaning of the law of the State of Tennessee in that:
>
> Petitioner[s] being maternal grandparents request[] temporary custody of said child. Petitioners state[] that legal custody is in the care of the natural mother via divorce decree. Petitioners state[] that the mother and father were married but were divorced February 2011. Petitioner[s] state[] that they are seeking temporary custody due to the mother's unsafe habits. Petitioners state[] that the mother and said child are living with them since said child was born. Petitioners state[] that the mother is bi polar and is abusing prescription and non-prescription drugs. Petitioners state[] that the mother has been in and out of several mental institutions which have not helped her at all. Petitioners state[] that the mother has stolen several items from the home including the grandfather's gun and may be carrying it around or has pawned it. Petitioners state that there is a concern for her since the mother has attempted suicide in the past. Petitioner[s] state[] that they have found ammo and even synthetic urine in her purse. Petitioners state[] that the mother also attacked both of them when said child was in the home but did not witness it. Petitioner[s] state[] that [the Child] has witnessed the mother to be very verbally abusive toward [P]etitioners.

Grandparents alleged that the address of Father was unknown.

Upon learning of the petition, Father filed a petition for modification, alleging that a material change in circumstances necessitated a change in the parenting plan as evidenced by Grandparents' petition for custody. Mother filed a handwritten response in which she denied any wrongdoing and asserted that she had received assistance for her behavioral issues that were largely the result of Father's long-term abuse. She claimed that she had resolved her differences with Grandparents and that the Child resided in a safe and stable environment with her and Grandparents. Grandparents filed a motion to intervene in the proceedings regarding Father's petition to modify. The trial court held the motion in abeyance while the case proceeded to a hearing.

Kathleen Overton, the Child's guardian ad litem, testified that she visited Father's residence to perform a home study and to speak with the Child. She recalled that she shared a meal with Father and the Child. She related that the Child showed her his bedroom, which he shared with two brothers. She claimed that the bedroom was "very appropriate" and that the house was adequate for everyone who resided in the home. She opined that the Child seemed "comfortable" during the meal and that she did not "see anything that was alarming to [her] at all about his behavior." She admitted that the Child was not as talkative with his siblings but asserted that he seemed "at ease."

Mother testified that she and Grandparents were concerned about the Child because his behavior often changed when he returned from visiting Father. She related that her disagreements with Grandparents stemmed from their objection to the Child's visitation with Father and her reaction to prescription medication. She conceded that she and Grandfather had fought in front of the Child but asserted that she and Grandfather had resolved their differences. She admitted that she pawned Grandparents' gun for money. She could not recall the number of times she or Grandparents had requested assistance from the police department in resolving their disputes. She claimed that despite extensive police intervention, the Child lived in a "very stable environment." She conceded that Father and Grandfather did not have a healthy relationship and that their inability to agree upset her.

Mother claimed that Father refused additional visitation time with the Child and was generally uninvolved in the Child's life at different times. She stated that Father refused to speak with her when she was pregnant with the Child and that she lived with Grandparents throughout her marriage to Father, who she claimed mentally and physically abused her. She acknowledged that she neglected to inform Father that she had served five days in jail after her arrest for shoplifting. She also acknowledged that she neglected to inform Father that she admitted herself into a treatment facility for approximately one week. She asserted that Father often refused her telephone calls and refused to communicate about the Child's well-being. She admitted that she refused Father's offers to parent the Child at various times while she received help because she was fearful that Father would not return the Child. She stated that the Child was often afraid to visit Father's house and that on two occasions, she and Grandparents videotaped his refusal to visit Father.

Grandmother identified the petition for custody that she and Grandfather filed. She asserted that she was simply concerned about Mother's unsafe habits, namely "leaving the curling iron on and talking on the phone in a car while driving." She denied her initial claim that Mother was abusing prescription drugs and asserted that Mother was simply experiencing "very serious side effects" from her Attention Deficit Disorder medication, Adderall. She recalled that Mother was not sleeping or eating and that the medication made her "more aggressive." She denied calling the police because of Mother's behavior and

-3-

insisted that she and Grandfather only called the police because the Child did not want to visit Father. She conceded that Mother had been hospitalized twice and that Mother had attempted suicide. She opined that Mother was "very capable" of parenting the Child and that her relationship with Mother had improved after Mother quit taking her medication.

Grandmother testified that the Child was "well-rounded" and was loving, caring, and smart. She said that she never discouraged the Child from visitation but that the Child did not want to leave and was also angry and upset when he returned from visitation.

Father testified that he was currently employed and had maintained his employment for approximately six years. He stated that he worked Monday through Friday and every fourth weekend and that his employment allowed him to provide health insurance for the Child. He related that he and his current wife, Jennifer Cantrell, were currently leasing a 2,400 square foot home and that Mrs. Cantrell's two children lived in the home with him and one of his three biological children. He opined that his relationship with his stepchildren was excellent. He claimed that he was unable to regularly exercise his visitation rights with the Child until he finally called the police to enforce his visitation rights. He related that since that time, he visited with the Child regularly. He stated that the Child enjoyed visitation with him and that the Child never seemed afraid while visiting him.

Father testified that Mother informed him of Grandparents' custody petition. He recalled that Mother "almost agreed" to let him take responsibility for the Child but that she eventually changed her mind. He stated that he sought designation as the Child's primary residential parent because he believed that the Child needed more stability. He was concerned about the Child's behavior, his eating habits, and his ability to attend school. He claimed that he loved the Child and desired to and was able to provide for the Child.

Father acknowledged that he had been arrested for domestic assault in May 2007. He stated that while he had been arrested, he was never charged with the offense. He acknowledged that he allowed Mother to retain custody of the Child when they initially divorced. He explained that he filed a petition for custody but that he eventually agreed to the parenting plan because he did not have confidence in his attorney. He related that he filed the petition for modification because Mother's behavior had escalated as evidenced by her arrest for shoplifting and numerous violent disagreements with Grandparents.

Grandfather testified that the Child was six months old when Mother moved into his house. He asserted that the Child and Mother enjoyed a "great relationship" and that Mother spent the majority of her time caring for the Child. He identified two video recordings in which he taped the Child prior to a visit with Father. He related that the Child did not want to visit Father and was visibly upset when leaving the house for visitation. He stated that he

-4-

called the police on several occasions because he wanted a record of the Child's refusal to leave for visitation. He insisted that the Child protested "just about every time" the Child left for visitation and often appeared distraught after returning from visitation. He acknowledged that he and Father did not have a good relationship. He related that he did not want the Child to live with Father, who had "a temper" and was "real dramatic." He admitted that he failed to contact Father when Mother was unavailable to parent the Child.

Grandfather testified that the Child had "quite good accommodations" in his home, specifically the Child had his own bedroom with his own television and games. He claimed that the Child exhibited appropriate behaviors for his age and also ate nutritious food. He related that he worked throughout the day but that Grandmother tended to the Child while he and Mother were working. He claimed that he enjoyed a good relationship with Mother and that he only filed the petition for custody because of her reaction to her prescription medication, Adderall. He stated that Mother was not sleeping or eating and exhibited aggressive behavior. He acknowledged that he called the police a few times because of his concern for Mother's well-being. He insisted that the Child never viewed their disagreements and that they were careful to talk in a different room when issues arose. He related that Mother quit taking her medication when he filed the petition for custody and that since that time, she had made a dramatic change. He opined that her demeanor was normal again and that she had gained weight and was eating regularly. He insisted that he did not have any concerns regarding Mother's ability to care for the Child and that she never neglected the Child, even when she was on her medication. He asserted that he and Grandmother should have custody of the Child if the court found that Mother was no longer able to parent the Child as the primary residential parent.

During Grandfather's testimony, a witness, Amy Burkhart, entered the courtroom. Mother ushered Ms. Burkhart outside, where she and Grandmother engaged the witness in conversation. Father objected to the witness because she had not been listed on the witness list and because he believed that Mother and Grandmother spoke to the witness about the proceedings. The court agreed with Father and disallowed testimony from the witness. However, the court allowed Mother to issue an offer of proof.

Following the presentation of the above evidence, the trial court denied Grandparents' request to intervene in the modification proceedings. The court found that a material change in circumstances had occurred that affected the Child's well-being in a meaningful way and that it was in the Child's best interest to designate Father as the primary residential parent. In so finding, the court found that Grandparents were not credible witnesses but that Father was a credible witness, whose "parenting ha[d] been undermined by the continuous interference by [Grandparents] and the bizarre behavior of [Mother]." This timely appeal followed.

## II.  ISSUES

We consolidate and restate the issues raised on appeal by Mother as follows:

A.  Whether the trial court erred in modifying the custody arrangement.

B.  Whether the trial court erred in precluding testimony from a witness.

Father raised an issue for our consideration on appeal that we restate as follows:

C.  Whether Father is entitled to attorney fees on appeal.

## III.  STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them.  *See* Tenn. R. App. P. 13(d).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness.  *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

In matters of child custody, trial courts are vested with broad discretion, and appellate courts will not interfere with the trial court's decision except upon a showing of erroneous exercise of that discretion.  *See Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997).  "'Because [c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions.'"  *Hyde v. Amanda Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct. 12, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).

## IV.  DISCUSSION

### A.

Mother asserts that the trial court erred in modifying the existing custody arrangement because there had not been a change of circumstances that necessitated a change in the custody arrangement and because a change in custody was not in the best interest of the

Child. Mother claims that she had addressed and corrected her behavioral issues prior to trial. Father responds that the trial court's decision was supported by the evidence.

"A custody decision, once final, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made." *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 246 S.W.2d 93, 95 (Tenn. 1952)). However, because the circumstances of children and parents change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." *Scofield*, 2007 WL 624351, at *2 (citing Tenn. Code Ann. § 36-6-101(a)(1)). Modification of an existing custody or visitation arrangement involves a two-step analysis. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). "If a material change in circumstances has occurred, it must then be determined whether the modification is in the child's best interest[]." *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (footnote omitted).

The determination of whether a "material change in circumstance" occurred requires a different standard depending upon whether a parent is seeking to modify custody (i.e., change the primary residential parent) or modify the residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). The Tennessee Code establishes a lower threshold for modification of a residential parenting schedule. *Scofield*, 2007 WL 624351, at *3. Here, the trial court modified custody by designating Father as the primary residential parent. Thus, the higher threshold applies. *Pippin v. Pippin*, 277 S.W.3d 398, 406-07 (Tenn. Ct. App. 2008). The Code provides, in pertinent part,

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.
>
> > (i) In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.

Tenn. Code Ann. § 36-6-101(a)(2)(B). "There are no hard and fast rules for when there has been a change of circumstances sufficient to justify a change in custody." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug. 22, 2008) (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003)). However, to determine whether a material change in circumstances has occurred, the court should consider whether:

> (1) the change occurred after the entry of the order sought to be modified; (2) the changed circumstances were not reasonably anticipated when the underlying decree was entered; and (3) the change is one that affects the child's well-being in a meaningful way.

*Cosner*, 2008 WL 3892024, at *4 (citing *Kendrick*, 90 S.W.3d at 570).

In this case, Mother's behavior progressively deteriorated while she resided with Grandparents. Despite Grandparents' retraction of their initial allegation that Mother was unfit, the record establishes that the Child's living environment had simply become unsafe and contentious and involved regular police intervention. While Mother may have made efforts to address her behavioral issues, the trial court found that Grandparents were not credible witnesses. Additionally, Grandparents and Mother admitted to hiding her behavior from Father in an effort to preclude his involvement with the Child. The increasingly hostile environment in which the Child lived and the interference with Father's ability to parent the Child was a material change in circumstances that was not reasonably anticipated and that affected the Child's well-being in a meaningful way. Accordingly, we conclude that the trial court did not err in determining that a material change in circumstances occurred, thereby necessitating the further determination of whether a change of custody was in the Child's best interest.

Having concluded that a material change in circumstances occurred, we must now determine whether the trial court erred in finding that the designation of Father as primary residential parent and the corresponding decision to award reasonable visitation to Mother was in the Child's best interest. While the court did not issue specific findings of fact on this issue, the record and the court's general findings support the trial court's ultimate decision. *See generally Cranston*, 106 S.W.3d at 645 (providing that the record on appeal and the court's findings were sufficient to facilitate appellate review even though the court applied the wrong standard when changing the original custody order). Indeed, the trial court is not required to articulate every fact and its application in custody cases. *See Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010) (stating that "while the statute requires the trial court to consider all the applicable factors, there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination").

However, "[w]hen the trial court makes no specific findings of fact . . . we must review the record to determine where the preponderance of the evidence lies." *Kendrick*, 90 S.W.3d at 570 (citing *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997)).

Relative to the child's best interest, Tennessee Code Annotated section 36-6-106(a) provides, in pertinent part,

> (a) In . . . any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made in the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out below, the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
>
> (1) The love, affection and emotional ties existing between the parents [] and the child;
>
> (2) The disposition of the parents [] to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent [] has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . .;
>
> (4) The stability of the family unit of the parents [];
>
> (5) The mental and physical health of the parents [];
>
> (6) The home, school and community record of the child;
>
> (7)(A) The reasonable preference of the child if twelve (12) years of age or older;
>
> (B) The court may hear the preference of a younger child on request. The preference of older children should normally be given greater weight than those of younger children;
>
> (8) Evidence of physical or emotional abuse to the child, to the other parent, or to any other person . . .;

(9) The character and behavior of any other person who resides in or frequents the home of the parent [] and the person's interactions with the child; and

(10) Each parent's [] past and potential for future performance or parenting responsibilities, including the willingness and ability of each of the parents [] to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

In setting the residential schedule, the trial court is also instructed to consider similar, relevant factors. *See* Tenn. Code Ann. § 36-6-404(b) (listing additional factors).

While Mother previously served as the primary caregiver for a number of years, the relevant factors are fairly equally weighted between the Parents. However, the record is clear that Mother's ability to parent the Child by herself without interference from Grandparents and to facilitate and encourage a close and continuing parent-child relationship between the Child and Father is severely lacking. With all of the above considerations in mind, we conclude that the preponderance of the evidence supports the trial court's naming of Father as the primary residential parent as being in the best interest of the Child. Accordingly, we affirm the decision of the trial court but further advise the Parents that failure to promote and encourage a close relationship between the Child and the other parent may result in the custody determination being reviewed in the future.

B.

Mother argues that the trial court erred in disallowing testimony from Ms. Burkhart without holding a full evidentiary hearing concerning whether her testimony had been influenced. Father responds that the trial court did not err in disallowing the requested testimony and that even if the court erred, the error was harmless when the testimony would not have influenced the court's decision.

In the offer of proof, Ms. Burkhart testified that she briefly talked with Mother and Grandmother in the hallway but insisted that they never discussed the trial. She stated that she simply told Mother that she was concerned that her testimony might be "taken out on [her] son" and that Mother responded in kind by stating that the Child would be at Father's on the same weekend too. She related that the rest of their conversation concerned her health and that Grandmother simply thanked her for testifying. Mother and Grandmother confirmed Ms. Burkhart's assertion that they never talked about the trial or her testimony.

-10-

Ms. Burkhart testified that she began dating Father in 2001 and that they had a child together. She stated that she and Father went their "separate ways" and that Father eventually began dating Mother, who subsequently had the Child. She related that she and Father did not have any contact for approximately two years and that her relationship with Father was currently limited to arranging his visitation with her child. She claimed that Father had trouble communicating with her, and she recalled one incident where she and Father had an argument while exchanging the Child for visitation. She asserted that her child was apprehensive about visitation with Father and often complained that he was too sick for visitation. She stated that she had to bribe her child to cooperate with the visitation schedule. She said that the Child was also usually temperamental when he returned from visitation with Father. She claimed that Father often neglected to instruct her child to take his medication and that his neglect harmed her child, who had to go to the emergency room because he had not taken his medication.

Assuming arguendo that the trial court erred in refusing to consider Ms. Burkhart's testimony, we find that such error was harmless. Our harmless error rule considers whether the error "more probably than not affected the judgment." Tenn. R. App. P. 36(b).[1] Here, Mother and Grandparents provided essentially the same testimony, namely that the Child did not want to leave for visitation and that Father was uncooperative. In disagreements pertaining to custody, a child's trepidation concerning leaving his or her primary residence to engage in visitation with the other parent is understandable and does not provide enough evidence to question that parent's ability to adequately care for the child once visitation commences. Ms. Burkhart's testimony was cumulative and would not have affected the court's judgment.

## C.

Father requests attorney fees on appeal. Tennessee Code Annotated section 27-1-122 provides for an award of sanctions in the form of attorney fees when an appeal is determined to be frivolous. To find an appeal frivolous, the appeal must be wholly without merit and lacking in justiciable issues. *See Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977); *Indus. Dev. Bd. of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). An appellate court's decision on this issue is discretionary, and this court is generally reluctant to award such damages because we do not want to discourage legitimate appeals. *Whalum v. Marshall*, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006). Following our review, we respectfully deny the request for attorney fees on appeal.

---

[1] "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Elisha Michelle (Cantrell) Dickerson.


_____
JOHN W. McCLARTY, JUDGE